**HOOTERS OF AMERICA, INC., Plaintiff,**

v.

**Annette R. PHILLIPS, Defendant.**

**Annette R. Phillips, individually and on behalf of all others similarly situated, Counterclaim Plaintiff,**

v.

**Hooters of America, Inc., and Hooters of Myrtle Beach, Inc., Counterclaim Defendants.**

No. 4:96–3360–22.

United States District Court, D. South Carolina, Florence Division.

March 12, 1998.

Vance J. Bettis, Gignilliat Savitz and Bettis, Columbia, SC, pro se.

Armand Georges Derfner, Charleston, SC, pro se.

William D. Deveney, Elarbee, Thompson and Trapnell, Atlanta, GA, pro se.

Brenda H. Feis, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, II, pro se.

Robert J. Gregory, Equal Employment Opportunity Commission, Washington, DC, pro se.

Mark D. Halverson, Elarbee, Thompson, & Trapnell, Atlanta, GA, pro se.

John S. Kiernan, Debevoise & Plimpton, New York City, pro se.

Peter G. Kilgore, National Restaurant Association, Washington, DC, pro se.

Sandra C. McCallion, Debevoise & Plimpton, New York City, pro se.

Lori Peterson, Minneapolis, MN, pro se.

Terry Ann Rickson, Charleston, SC, pro se.

Justin S. Weddle, Debevoise & Plimpton, New York City, pro se.

Stanford G. Wilson, Elarbee, Thompson & Trapnell, Atlanta, GA, pro se.

**⁰ORDER**

CURRIE, District Judge.

## CONTENTS

I. BACKGROUND ................................................... 588

II. PROCEDURAL HISTORY .......................................... 588

III. HOA'S § 4 MOTION TO COMPEL ARBITRATION ...................... 593
 A. Hooters' Arguments to Compel Arbitration .......................... 593–
 1. The Making of the Arbitration Agreement ........................ 593
 2. Misrepresentation Issues ....................................... 595
 3. Unconscionable Adhesion Contract .............................. 595
 4. Fairness of Arbitral Procedures & Rules .......................... 595
 5. Interpretation of Arbitral Rules ................................. 595
 B. Phillips' Arguments Opposing Arbitration .......................... 596
 1. General ....................................................... 596
 2. Absence of Essential Terms of Arbitration Agreement ............. 596
 3. Misrepresentation of Arbitral Process as Fraud in the Inducement ..... 596
 4. Selective Incorporation of Unconscionable Rules into the Arbitration Agreement ....................................................... 597
 5. Voiding of Arbitration Agreement Based on Restrictions on Substantive Title VII Rights and Remedies ................................... 599

IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO MAKING OF CONTRACT AND MISREPRESENTATION ........................... 602

V. CONCLUSIONS OF LAW ON UNCONSCIONABILITY AND PUBLIC POLICY ....................................................... 608
 A. FAA Principles ................................................. 608
 1. Generally ..................................................... 608
 2. Substantive arbitrability inquiry ................................ 609
 3. Section 1 Exemption .......................................... 609
 4. Test for Motion to Compel Arbitration .......................... 609
 B. The State Law Inquiry Whether the Parties Agreed to Arbitrate .......... 610
 1. Generally ..................................................... 610
 2. Elements of an Agreement ...................................... 610
 3. Other Validity Challenges under State Law ........................ 611
 4. Fraudulent Inducement as a Matter for Federal Court Resolution ...... 611
 5. Unconscionability ............................................. 613
 6. Public Policy Violation ......................................... 615
 7. Illusory Promise .............................................. 617
 C. Fundamental Requirement of Arbitrator Impartiality and Fairness of Procedure ....................................................... 618
 1. Generally ..................................................... 618
 D. Whether Congress Intended Title VII Claims to be Nonarbitrable .......... 620
 1. History of Arbitration of Statutory Claims ........................ 620
 2. The Gilmer-exception: Where Arbitration is Inadequate to Protect Federal Rights ................................................ 621
 3. Public Policy as a Matter of Post–Award Review under 9 U.S.C. § 10 .......................................................... 623

VI. REMEDIES OF CONTRACT REFORMATION OR SEVERANCE .......... 624
 A. Generally ...................................................... 624
 B. Reformation ................................................... 624
 C. Severance ..................................................... 624
 1. Generally ..................................................... 624
 2. Arbitrator Selection Provisions and 9 U.S.C. § 5 .................... 625

588

3. Other Rules Provisions: Attempting to Reconcile Conflicting
 Provisions ............................................... 626

VII. CONCLUSION ................................................. 627

## I. BACKGROUND

This is a declaratory judgment and Title VII case involving a former "Hooters Girl," who complains of sexual harassment by Hooter's managers and the brother of the company's CEO. The case is unusual for several reasons. Unlike the party alignment in the typical employment discrimination case, the plaintiff here is the former employer, Hooters of America, Inc. ("hereinafter HOA") and the employee, Ms. Phillips, is the defendant (hereinafter "Phillips"). Second, the case includes both an individual and a class counterclaim brought by Phillips and all other similarly situated Hooters Girls against HOA and its Myrtle Beach, South Carolina, facility, "Hooters of Myrtle Beach," (hereinafter "HOMB"), which is alleged to be the former joint employer of Phillips.[1]

The matter is before the court on HOA's "Motion for Preliminary Injunction," filed November 8, 1996, treated as a motion to compel arbitration under 9 U.S.C. § 3. Also before the court is Hooters' Motion to Stay Proceedings, filed February 25, 1997, which seeks to stay the non-arbitrable Rule 23, FRCP, allegations of the counterclaim under 9 U.S.C. § 3. The court has had extensive briefing and oral argument, and has conducted an evidentiary hearing on factual issues pertinent to the motions. The matter is ripe for adjudication. For the reasons given below, the court finds that both HOA's motion to compel arbitration and Hooters' motion to stay should be DENIED.

## II. PROCEDURAL HISTORY

This case has a long and convoluted procedural history. An understanding of this procedural history is, however, essential to understanding the present posture of the case.

The case commenced when HOA filed a complaint on November 4, 1996, seeking a declaratory judgment, 28 U.S.C. § 2201, that the November 25, 1994, and April 23, 1995, arbitration agreements signed by Phillips were valid and enforceable. Jurisdiction was alleged to be based on diversity of citizenship, 28 U.S.C. § 1332. HOA also sought injunctive relief restraining Phillips from pursuing legal proceedings in state or federal court arising from her former employment at HOMB. On November 8, 1996, HOA filed a motion for preliminary injunction. This motion asked the court to restrain Phillips from filing any state or federal court action relating to her former employment, and to compel arbitration of Phillips' claims under 9 U.S.C. § 4. This motion is hereinafter referred to as "the § 4 motion."

On January 15, 1997, Phillips filed her initial opposition to the § 4 motion. The next day she filed an answer to the complaint, and interposed a counterclaim against HOA, and additional counterclaim defendant HOMB. The answer denied that Phillips had entered into an enforceable arbitration agreement covering her dispute with HOA. Phillips asserted that the agreements were neither knowingly nor voluntarily entered into, and were unconscionable adhesion contracts violative of public policy. Moreover, the answer asserted that the alleged arbitration agreements were not supported by adequate consideration and were illusory. Finally, Phillips' last defense contended that HOA's purported "arbitration" plan did not constitute *bona fide* arbitration within the meaning of the Federal Arbitration

---

1. Collectively the two defendants, HOA and HOMB, will be referred to as "Hooters."

Act, 9 U.S.C. §§ 1 *et seq.*, because the procedures deprived Phillips of due process, substantive protection against sexual harassment, and statutory remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

Phillips' counterclaim is comprised of two parts. The first part is an individual action by Phillips seeking damages and injunctive relief against Hooters for violations of Title VII, based on the alleged hostile environment and harassing behavior, culminating in a constructive discharge. Although Phillips' individual counterclaim enumerates several incidents of hostile behavior,[2] the primary complaint concerned a June 19, 1996, incident between Phillips and Gerald Brooks, the brother of the Hooters CEO. Robert Brooks.[3] While Phillips was bartending at HOMB, Gerald Brooks allegedly grabbed and slapped Phillips' buttocks while in the presence of HOMB management and customers. Phillips responded that Brooks should not touch her, to which he allegedly responded that "he would cram her shorts down her face." Phillips further contends that HOMB management witnessing the event advised her that she should let the matter go because nothing could be done to correct Gerald Brooks' behavior as he was the brother of the CEO. As a result, on June 25, 1996, Phillips submitted her written resignation citing the incident of June 19 and management's alleged failure to take remedial action as the reason for her constructive discharge.

Phillips' individual counterclaim further alleges that Gerald Brooks sexually assaulted another Hooters Girl on June 19.

Phillips avers that HOA and HOMB management were well acquainted with Gerald Brooks' habit of harassing Hooters Girls, and took no remedial measures.

Phillips received her Notice of Right to Sue from the EEOC on November 25, 1996, for her individual counterclaim and filed the action within 90 days, on January 15, 1997. Her counterclaim for sexual harassment seeks damages, injunctive relief, and reinstatement to a harassment-free workplace.

The second part of the counterclaim (hereinafter "the class counterclaim"), is brought on behalf of Phillips and a proposed class, described as:

> All Hooters non-managerial female employees, all or most of whom are known as "Hooters Girls," who are, have been, or will be employed by Hooters of Myrtle Beach, Inc., or by Hooters of America, Inc., its subsidiaries, affiliates, licensees, franchisees, or any employer for whom HOA provides management services and who may have been or may be required or asked to sign agreements to arbitrate employment-related disputes.

Answer and Counterclaim, filed 1/15/97, at 9. The class counterclaim alleges Hooters has compelled the classmember employees to execute arbitration agreements, and that Hooters intentionally deprives the class members of any knowledge of the procedures employed in the arbitration proceeding, or the statutory remedies being forfeited. The class counterclaim asserts that in Phillips' own case, Hooters

---

2. *E.g.*, the counterclaim asserts that Hooters Girls were forced to play sexually degrading games such as "Pin the tail on the Penis" to determine to which restaurant area they would be assigned. The counterclaim also alleges that Hooters managers exposed their genitals and underwear to female employees, and that one manager offered "bounty money" to other managers who would find reasons to "write up" less attractive female employees, in order to eliminate them from the workplace. Of course, the court is well aware that on a motion to compel arbitration the court is not to consider the merits of the dispute. The court summarizes the contents of the pleadings only as an aid to understanding the full procedural history.

3. It does not appear Gerald Brooks was an employee of HOA, but he served as their liquor licensing agent in South Carolina. Allegedly he frequently visited HOMB, considered himself "one of the family," and victimized several of the female employees.

took the position that Phillips could not pursue her Title VII claim in court, and should proceed to arbitration to be conducted under purportedly unfair procedures not even promulgated until after Phillips had left Hooters' employ. The class counterclaim thus asserts that Hooters will attempt to enforce these purportedly unfair arbitration procedures against any class member who seeks a judicial forum for violations of Title VII.

The class counterclaim asserts four causes of action. The first claim is for a declaratory judgment that the purported arbitration agreements deprive class members of substantive and procedural rights under Title VII and are unenforceable.[4] The second cause of action, based on an alleged violation of § 703 of Title VII, 42 U .S.C. § 2000e–2, asserts that promulgation of such mandatory and unfair arbitration procedures deprives the proposed class of equal employment opportunities because of their sex, and is itself a violation of Title VII. In the third cause of action, Phillips contends that Hooters has retaliated against class members who have opposed its unlawful employment practices, in violation of § 704 of Title VII, 42 U.S.C. § 2000e–3. The fourth cause of action asserts that by its promulgation of such mandatory unfair arbitration procedures. HOA has deprived the class members of the right to an impartial determination of a civil action and the right to substantive remedies guaranteed by law, on account of their sex, in violation of § 706(f) & (g) of Title VII, 42 U.S.C. § 2000e–5(f) & (g).

Phillips received her Notice of Right to Sue on the arbitration issue class counterclaim involving the arbitration agreement on January 9, 1997, which was within 90 days of the filing of the counterclaim. Phillips alleges individual injury on the class counterclaim from mental anguish and emotional distress resulting from Hooters' invocation of the unfair arbitration procedures, and seeks back pay, reinstatement or front pay and benefits, compensatory and punitive damages. On behalf of the class she requests compensatory and punitive damages, declaratory and injunctive relief.

On February 13, 1997, Hooters filed its "Answer to Counterclaim and Demand for Arbitration." Hooters admitted that its employees had executed various agreements and asserted that the documents spoke for themselves. Moreover, Hooters asserted that it had a progressive "open door" policy, part of which prohibited sexual harassment and provided a mechanism for reporting it. Hooters admitted, however, that Gerald Brooks entered the HOMB location on June 19, 1996, and that Phillips was the Hooters Girl on duty at the bar. Hooters disputed Phillips' interpretations of the Hooters arbitration rules. Hooters admitted that it requested that Phillips proceed to arbitration and that it instituted the principal claim in an effort to accomplish that.

As to the class counterclaim. Hooters disputed the validity of such counterclaim, but admitted that the class counterclaim would not be subject to arbitration under any provision of its arbitration agreement.[5]

---

4. Specifically, the counterclaim alleges that the HOA arbitration procedures: (1) require Phillips to submit to arbitration before a panel selected by HOA; (2) deprive her of the possibility of full punitive damages; (3) deprive her of the possibility of compensatory damages; (4) prevent her from seeking any change in discriminatory practices; (5) subject her to the payment of HOA attorney's fees; (6) require her to forfeit her rights to independent determinations of state and federal agencies; (7) restrict her discovery unreasonably; (8) require her witnesses to be sequestered while not imposing the same requirement on HOA employees; (9) give HOA the only right to make a transcript of the proceeding; (10) provide that her remedy shall be limited to the lesser of what HOA or the law provides; and (11) allow HOA to change the rules at any time. Answer & Counterclaim, filed 1/15/97, at 11.

5. Therefore, Hooters contended the class counterclaim should be stayed pending resolution of the balance of the case.

Hooters asked that the counterclaim be dismissed with prejudice, and it be awarded costs and expenses, including attorney's fees.

Following the volley of initial pleadings,[6] the parties began submitting extensive briefs on the outstanding § 4 motion. The court scheduled a hearing on the motion for February 28, 1997. However, on February 25, 1997, Hooters filed a motion to stay proceedings pending arbitration. Hooters contended, in part,[7] that any discovery served by Phillips pertinent to her individual counterclaim was inappropriate. This motion is "the § 3 motion." That same day the court held a telephone status conference with counsel in which the court ordered Phillips to respond to the § 3 motion and tolled the time for answering any discovery pending the court's resolution of the outstanding motions.

Thereafter the parties initiated voluminous briefing relative to the § 4 motion, prompting several requests for extensions of time to respond. Hooters challenged Phillips' inclusion of certain affidavit evidence of Susan Ainsworth, a former HOA manager, and moved, on April 11, 1997, to strike and seal the Ainsworth declaration on attorney client privilege grounds. Hooters contended Phillips' counsel had violated ethical rules in securing the Ainsworth declaration. At a telephone conference hearing held April 23, 1997, the court deferred ruling on the Ainsworth declaration issue pending receipt of further briefing from the parties, but ordered limited discovery. The court concluded that in order for Phillips to respond properly to the § 3 and § 4 motions, she was entitled to limited discovery relative to the circumstances surrounding the making of the alleged arbitration agreement. The court authorized limited discovery in the form of interrogatories, requests to produce and five depositions.

On May 7, 1997, Hooters submitted an *in camera* declaration of James P. Dirr. Esquire, its General Counsel, accompanied by a motion to place the declaration under seal on the grounds of attorney client privilege. The Dirr declaration pertained to the circumstances surrounding adoption of the Hooters arbitration program, including the role assumed by Dirr. The Dirr declaration also addressed Dirr's participation in the "roll out" of the arbitration program to Hooters General Managers on October 25, 1994, in Atlanta. The Dirr declaration was submitted to support Hooters' contention that several matters addressed at the October 25, 1994, meeting were privileged on attorney client grounds. In a telephone conference on May 29, 1997, the court agreed with Hooters that the Dirr declaration contained some protected matter, and ordered that a redacted version be provided to Defendant, and the original be maintained under seal.

In the same telephone conference the court also denied Hooters' motion to strike the Ainsworth declaration, finding that Defendant's attorneys committed no ethical violation in procuring the affidavit. As to several documents which Hooters claimed were not discoverable on attorney client privilege grounds, the court ordered Hooters to compile a privilege log of such documents, and established a method for resolving such objections.[8] Finally, as to

---

**6.** Hooters filed a First Amended Answer to Counterclaim on February 25, 1997, which was not materially different from the earlier pleading.

·**7.** The § 3 motion sought to stay judicial proceedings on the individual counterclaim as well as the class counterclaim.

**8.** Hooters filed its Motion for a Protective Order on June 30, 1997, which was supported by a second *in camera* declaration of Dirr.

The Dirr declaration detailed events surrounding adoption of the Hooters arbitration program. The court ultimately ruled in a July 8, 1997, teleconference hearing that the motion for protective order should be granted in part, and that portions of the second Dirr declaration should be redacted, and an edited declaration served on Phillips.

As to the documents listed on the privilege log which were withheld by Hooters, the court directed Hooters to submit those docu-

issues pertaining to validity of the arbitration agreements, the court concluded it had received conflicting affidavit evidence concerning the roll out of the arbitration program in Myrtle Beach in November, 1994,[9] and the General Manager's meeting in Atlanta,[10] all of which pertained to the making of the agreement itself. Accordingly, the court found that an evidentiary hearing would be required:

> [A]nd the actual evidence that I think I will need will be what I call formation evidence or fact evidence relating to what happened at Myrtle Beach on the relevant dates, and to the extent that what happened somewhere else is pertinent or relevant to what may or may not have happened in Myrtle Beach and is disputed, then anything that relates to that. But I would not hear evidence on what I call validity issues, as to the arbitration rules. I think that I can rely for that on the rules themselves and the affidavits that have previously been submitted.

> At this point, we have controverted facts on issues that relate to formation with regard to Ms. Phillips' agreement to arbitrate, and on those, I will take evidence.

Tr. of May 20, 1997, telephone conference, at 34. The court set an evidentiary hearing for July 17, 1997.

Just prior to the evidentiary hearing, on July 15, 1997, Phillips filed her motion to certify the class action counterclaim. The court suspended the time period for Hooters' response to the motion, pending the court's rulings on the §§ 3 and 4 motions. On the same date Phillips also moved to amend her answer and the counterclaim. Phillips wished to amend her individual pleadings and the class counterclaim pleadings to add an additional defense that the arbitration agreements were obtained by intentional or negligent misrepresentation. Hooters filed its opposition to the motion to amend on July 16, 1997. At the commencement of the hearing on July 17, 1997, the court granted Phillips' motion to amend, finding that Phillips did not discover certain information pertinent to the new defenses until discovery. Accordingly, the court ruled that the liberal amendment provisions of Rule 15(a), FRCP, authorized the amendment.

The parties asked the court to consider as evidence excerpts of several depositions. Accordingly, the court reviewed the depositions of Paul G. Schaefer (former HOA Director of Human Resources). Susan Ainsworth (former Hooters General Manager in Athens. Georgia). Christopher Watson (former HOMB General Manager), Gene Fulcher (former HOMB General Manager), and Defendant and Counterclaim Plaintiff Annette Phillips. The parties also presented numerous live witnesses, including Paul G. Schaefer, Gene Fulcher. Annette Phillips, Susan Ainsworth, Dennis Lamberjack (former HOMB assistant kitchen manager). Leon Kulasa (former HOMB assistant manager). Donna Wilette (former HOMB Hooters Girl), Shelley Pauley (former HOMB Hooters Girl), and James Dirr (HOA General Counsel). The court has also considered

---

ments in a sealed envelope to the court by July 3, 1997. Thereafter, the documents and privilege log were reviewed by a United States Magistrate Judge, who recommended a finding that certain documents were privileged. At the request of the parties, this court did not review the actual documents listed on the privilege log, but did review the Magistrate's recommendation. In the July 8 hearing the court sustained several of Plaintiff's objections and overruled others.

9. *E.g.*, Gene Fulcher, former Manager at the Myrtle Beach location, had testified that in order to ensure the employees' voluntary acceptance of arbitration, he had refused to accept any signed arbitration agreements until five days had elapsed after the roll out, a fact disputed by other witnesses.

10. *E.g.*, Ms. Ainsworth stated that at the Department Managers' roll out, attendees were specifically told the arbitration program did not apply to sexual harassment cases, whereas other witnesses disputed that.

all documents filed as attachments to pre-hearing memoranda on the §§ 3 and 4 motions. Following continuation of the hearing on July 18, 1997, the court, at the request of the parties, recessed until September 29, 1997. On that date Hooters called its final witness, James Dirr, after which the parties offered closing arguments.

Thereafter, the court announced its preliminary oral ruling. The court stated that it intended to deny Hooters' § 4 motion and would refuse to compel arbitration. The court found that although Phillips had failed to establish either fraud, coercion or negligent misrepresentation in the making of the arbitration agreement, the procedural Rules drafted by Hooters were plagued with infirmities. The court reasoned that in order to determine whether an enforceable contract was formed or if there was a valid ground for revocation, the court had to examine the substance of the procedural rules, especially because one of the challenges was unconscionability. In doing so, the court concluded that the proposed Hooters arbitration Rules were so one-sided in Hooters' favor and so oppressive to the employee that the Rules violated public policy and were unconscionable. In addition, the court concluded that certain provisions of the procedural Rules, which allowed Hooters to modify the Rules without notice, rendered the agreement illusory.

The court also observed that it had given serious consideration to whether the court could sever the invalid portions of the procedural rules and compel the case to arbitration under court-modified procedural rules. The court found, however, that the existing procedural rules were so conflicting, ambiguous, and poorly drafted

that no arbitrator would be able to understand any redacted version of the rules. The court also recognized the limits placed on its ability to rewrite the parties contract under South Carolina law. Accordingly, the court announced that it would draft a written order detailing its findings, and that the case would be stayed pending issuance of the order.

### III. HOA'S § 4 MOTION TO COMPEL ARBITRATION

The parties' arguments, supplemented by the evidence adduced at the hearing, are as follows.

#### A. Hooters' Arguments to Compel Arbitration

##### 1. The Making of the Arbitration Agreement

In overview, Hooters' arguments to compel arbitration rest initially on three assertions: (1) that on two different occasions Phillips knowingly and voluntarily entered into an enforceable arbitration agreement that incorporated certain Rules [11] and which covered the instant individual Title VII claim: (2) that Phillips has failed to prove any affirmatively fraudulent or negligent misrepresentations by Hooters in the making of the agreement: moreover, because no special relationship existed between the parties. Hooters was not required to disclose the terms of the Rules to Phillips: and (3) that Phillips has failed to prove that the arbitration agreement was an unconscionable adhesion contract. Hooters contends the court's analysis should stop there, and that any further review of the purported "fairness." or due process Phillips would receive under the

---

11. The arbitration agreements executed by Phillips incorporated by reference a set of Arbitration Rules (hereinafter "the Rules"), which Hooters claimed authority to modify unilaterally without notice. In the present case, the first version of the Rules. Joint Exhibit 3, which state "effective November 1, 1994," applied at the time Phillips executed the November 25, 1994, agreement. It is,

however, a later set of Rules, with an effective date of July 23, 1996, Joint Exhibit 4, adopted one month following Phillips' resignation, that Hooters claims applies to Phillips' present claims. Accordingly, the court has construed Hooter's motion to compel arbitration as one requesting arbitration under the two arbitration agreements, which are identical, and the July 23, 1996, Rules.

Rules is inappropriate at this juncture. Hooters contends such review might be suitable at an award review initiated under 9 U.S.C. § 10.[12]

Hooters points to the broad language of the arbitration clause executed by Phillips on two occasions:

In consideration of the Company offering you employment and employing you, you and the company each agrees [sic] that, provided, when appropriate, the employee, complies with the company's open door policy and/or compliance resolution procedure, the employee and the company agree to resolve any claims pursuant to the company's rules and procedures for alternative resolution of employment-related disputes, as promulgated by company from time to time (the "Rules"). Company will make available or provide a copy of the rules upon written request of the employee.

Joint Exh. 1 & 2.

As to the circumstances regarding the making of the arbitration agreement. Hooters relies on Paul Schaefer's testimony that he instructed all General Managers at the October 25, 1994, meeting in Atlanta on the specific manner in which the roll out should be accomplished. The key elements of the plan were that General Managers would use a fixed agenda and read from documentation supplied by HOA and would require each employee to hold the arbitration agreement for at least five days before signing. Two General Managers attending the Atlanta meeting. Fulcher and Watson, corroborated Schaefer's testimony. Hooters points to Gene Fulcher's testimony that he conducted the roll out according to the guidelines established at the Atlanta meeting. Moreover. Fulcher testified (1) that each of his employees was required to hold the arbitration agreement at least five days before signing it in his presence and the presence of another witness: (2) that he told employees, including Phillips, that they should have the arbitra-

tion agreement reviewed by a lawyer, if they wished: (3) that he also informed employees they could decline to sign the arbitration agreement, but that they would not be eligible for further promotion: and (4) that he informed employees that the procedural rules to be used in arbitration, while not available at HOMB, were available by request in writing to a Divisional Vice–President. Unquestionably Phillips executed an arbitration agreement, dated November 25, 1994, that expressly covered sexual harassment claims. Jt. Exh. 1 at ¶ 1 ("[r]elating to any claim of discrimination, sexual harassment, retaliation, or wrongful discharge, whether arising under federal or state law, by a statute, rule, regulation or common law . . .").

Fulcher's testimony regarding roll out procedures was corroborated by Ms. Willette, who testified that Fulcher had advised them of the Rules' availability, and by Ms. Pauley, who testified that she followed Fulcher's suggestion and took her agreement to a lawyer.

Although Chris Watson was a General Manager of the Baltimore Hooters location at the time of the 1994 roll out, he transferred to HOMB in March 1995. Upon reviewing HOMB employees' files for completeness, he noted several omissions, and requested that all employees execute another arbitration agreement. He testified he told the employees he was updating their files and wanted them to fill out new-hire packets. He testified he told the employees they had the right to decline the arbitration agreement and retain their jobs. He testified that Annette Phillips executed her second arbitration agreement on April 23, 1995, (Watson Depo. at 159). This agreement contained the same language as the first arbitration agreement as to its coverage of sexual harassment claims.

Hooters thus contends that Phillips twice failed to avail herself of the opportu-

---

12. In the alternative, should the court engage in a fairness review, Hooters insists that its Rules should not be construed in the one-sided manner suggested by Phillips.

nities to have the arbitration agreement reviewed by a lawyer or to request a copy of the Rules. Hooters points to Mr. Dirr's testimony that the Rules had been drafted and were in existence during the initial roll out period. Hooters thus relies on the preceding evidence and the language of the arbitration agreement to argue that Phillips knowingly and voluntarily entered into an arbitration agreement that specifically covered sexual harassment claims and that any lack of information regarding the Rules was Phillips' own fault.

### 2. Misrepresentation Issues

As to Phillips' claims of fraudulent or negligent misrepresentation. Hooters claims there is a total lack of evidence of an actionable misrepresentation. Even if testimony that Schaefer described the arbitration program at the Atlanta roll out as "fair" is credited. Hooters contends Phillips was unaware of such statement and could not have relied on it. Hooters also insists that Phillips' claim of fraud in the omission fails because Hooters had no duty to furnish a copy of the Rules to Phillips at the time of signing the agreement. Hooters claims such a duty would arise, if at all, only in a situation of a special or fiduciary relationship, Finally. Hooters notes that arbitration agreements often incorporate by reference procedural rules, and that the relationship between the parties was arms length. Hooters notes that this is not a case of an ignorant and unwary person entering into an agreement, relying on Phillips' self-described assessment of herself as having "above-average judgment." Accordingly, Hooters concludes that Phillips has failed to prove fraudulent or negligent misrepresentation that might vitiate the arbitration agreement.

### 3. Unconscionable Adhesion Contract

Hooters insists that Phillips' arguments that the arbitration agreement was an unconscionable adhesion contract are groundless. It points to testimony that the employees could decline to sign the agreement and retain their jobs, and that Phillips never heard of anyone being fired for refusing to sign.

### 4. Fairness of Arbitral Procedures & Rules

Hooters also insists that the court would be in error to conduct an unconscionability or public policy analysis of the Rules at the 9 U.S.C. § 2 stage. Hooters relies on *O'Mary v. Mitsubishi Electronics America, Inc.*, 59 Cal.App.4th 563, 69 Cal. Rptr.2d 389 (4 Dist.1997), for the proposition that a § 2 review is narrow, and *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), for the contention that disputes that are not about the making of the arbitration agreement are for an arbitration forum to decide, subject to review at the award enforcement stage. Hooters also cites *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446 (4th Cir. 1997), for the proposition that the court may not reach procedural arbitrability issues until after arbitration and *Local Union Number 637 v. Davis H. Elliot Co., Inc.*, 13 F.3d 129, 132 (4th Cir.1993), for the proposition that a subsequent defense to arbitrability is within the jurisdiction of the arbitration forum. As to alleged infirmities concerning the method for arbitrator selection under its Rules. Hooters insists that this is a procedural matter for the arbitrator to consider, and would only be § 10 award review matter for this court. Finally, Hooters argues that any cases finding that the court should perform a "gatekeeper" function at the time of a motion to compel arbitration, are wrongly decided.

### 5. Interpretation of Arbitral Rules

Although, as noted above, Hooters claims that this court cannot construe the terms of the Rules incorporated into the arbitration agreement. Hooters insists that Phillips interpretation of the Rules is erroneous. The current version of Hooters' Rules, adopted July 23, 1996, is set forth at Joint Exh. 4. Hooters points to Rule 22–1 as evidence that all Phillips statutory rights would be preserved in the

arbitration forum. Hooters contends Rule 19–1, the Rules' damages provision, is supplemented by Rules 19–2, 19–5 and 19–7, and allows for just and reasonable punitive damages. Hooters points to Rule 19–1(a)'s provisions for backpay, from which collateral sources must be offset. Hooters insists that under Rule 19–1 reasonable attorney's fees and costs are recoverable, including attorney's fees and costs as sanctions. Rules 20–1 and 20–2. As to the Rules' provision for arbitrator selection, see Rules 8–1 through 8–9. Hooters points to language *from Mitsubishi* refusing to indulge a presumption that arbitrators will be less than impartial, see *Mitsubishi*, 473 U.S. at 634, 105 S.Ct. 3346, and a January 27, 1995, letter from Hooters' General Counsel soliciting experienced lawyers for Hooters' arbitration pools. See Pltf's Exh. 1. Finally, Hooters argues that the Rules are expendable. Under section 3 of both arbitration agreements executed by Phillips.

> [i]f any provision of ... the Rules is declared void, or otherwise unenforceable, such provision shall be deemed to have been severed from this Agreement, which shall otherwise remain in full force and effect; provided that Company shall be permitted a reasonable opportunity to unilaterally amend ... the Rules to legally effect the ability of the Employee and the Company to arbitrate Claims as contemplated by this Agreement.

Thus, while Hooters contends the court's interpretation of the Rules is unwarranted, it insists that even if the court's review indicates the Rules are unenforceable, the court must nevertheless compel arbitration, after having severed the unenforceable provisions or allowing Hooters to amend its provisions.

## B. PHILLIPS' ARGUMENTS OPPOSING ARBITRATION

### 1. General

In overview, Phillips contends any arbitration agreement signed by her is subject to revocation on the following grounds: (1) that the essential terms of the contract, *i.e.*, the Rules, were not available to Phillips at the time of executing the agreement: (2) that Hooters misrepresented the terms of the arbitral process at the November 1994 roll out meeting, constituting fraud in the inducement of the arbitration agreement: (3) that the arbitration agreement and its incorporated Rules are unconscionable, and were executed by Phillips while she was under economic duress; and (4) that the arbitration agreement and its incorporated Rules violate Title VII and are void as against public policy. Phillips relies on the following evidence to establish her revocation grounds.

### 2. Absence of Essential Terms of Arbitration Agreement

Phillips contends that because the Rules provide the only source of information concerning the substantive rights and procedures to be followed in arbitration, the Rules were essential terms of any arbitration agreement. Phillips further asserts that the Rules were not in existence at the time of the November 24, 1994, meeting, relying on an in-house memorandum of Paul Schaefer dated January 17, 1995, in which earlier versions of the Rules were referred to as "draft copies." Def's Exh. 1. In addition, Phillips points to Rule 24–1, which provides that Hooters may amend the Rules without notice, as proof that Hooters' so-called "agreement to arbitrate" was wholly illusory and did not bind it to any specific promise. Based on the foregoing, therefore, Phillips contends that no arbitration agreement ever arose, or, if it did, it is subject to revocation.

### 3. Misrepresentation of Arbitral Process as Fraud in the Inducement

Phillips contends that Hooters' knowing concealment of the Rules and the manner in which it conducted the HOMB roll out in November 1994 misrepresented the arbitration program, constituting fraud in the inducement, a ground for revocation.

Phillips points to evidence that the HOMB roll out was conducted in a noisy, rushed atmosphere, which she contends thwarted careful consideration of the arbitration agreement. The roll out covered three distinct areas: the new employee handbook, the HOA Alternative Dispute Resolution (ADR) Agreement, and employee benefits information. Joint Exh. 6. She argues that the roll out agenda and materials were either purposefully or negligently designed to confuse the employees concerning the ADR program. She points to numerous references to the "open door policy," "compliance resolution procedure" and "arbitration" in the roll out documents and contends the documents appear to interchangeably confuse the processes. She notes that the 1994/95 Employee Handbook, Def's Exh. 8,[13] discussed Hooters' sexual harassment policy but failed to mention that any such claims would be subject to arbitration. Phillips argues that an explanation of the ADR program read aloud at the roll out meeting, Joint Exh. 7, fails to reference the Rules, and that the employee handbook, Joint Exh. 8, only discusses arbitration in one paragraph and inconsistently uses the term "ADR" (formerly used in other documents to refer collectively to the open door, CRP, and arbitration processes) in lieu of "arbitration." Moreover, Phillips contends that the one paragraph discussion, Joint Exh. 8 at 7–8, erroneously implies that arbitration is an appeal from an unsuccessful CRP matter. Additionally, she argues that paragraph 2 of the arbitration agreements signed by her, Joint Exhs. 1 & 2, also implies that arbitration would be an appeal of an unresolved CRP matter. Finally, she notes that neither the roll out documents nor the employee skit conducted at the meeting alerted any employee that

they would be giving up their right to go to court by signing the arbitration agreement. In summary, then, Phillips contends the preceding circumstances establish fraud under *Prima Paint*. 388 U.S. at 402, 87 S.Ct. 1801.

### 4. Selective Incorporation of Unconscionable Rules into the Arbitration Agreement

Phillips urges this court to find, as a matter of law, that the Hooters Arbitration Agreement and Rules are unconscionable, and provide an adequate ground, in law or equity, to revoke Phillips' agreements. Phillips relies in part on the testimony of Hooters' General Counsel to show unconscionability. James Dirr, Hooters General Counsel, testified that he drafted the Arbitration Agreement and Rules at the request of the HOA board of directors in 1994. He testified that the first version of the Rules had been adopted by the time of the Atlanta General Managers meeting in October 1994 and would have been available upon request to any employee in November 1994. Dirr admitted that the Divisional Vice–Presidents did not have a final copy of the Rules until January 1995, but insisted they had received a draft prior to that time.

Dirr further testified that in 1994 he received a copy of a model arbitration agreement and procedures promulgated by the Center for Public Resources, Inc. (CPR), an association of management lawyers. He testified that he modeled the Hooters Rules very closely after the CPR rules.[14] It appears, however, that the CPR model rules examined by Dirr in 1994, Joint Exh. 16, were published in 1990, prior, of course, to the adoption of the 1991 Amendments to the Civil Rights

**13.** The handbook is prophetically inscribed. "[T]he soon to be relatively famous Hooters Employee Handbook."

**14.** In fact, Hooters counsel represented to the court at trial that the Hooters Rules were almost a "verbatim" copy of the CPR rules. Even a casual inspection of the CPR rules, Joint Exh. 16, reveals, however, that the

Hooters Rules differ considerably from the CPR rules, and without exception, the differences favor the employer. See Appendix to HOA's and HOMB's Reply to Defendant's and Counterclaim Plaintiff's Supplemental and Opposition Memorandum, filed April 14, 1997, at Exh. 1.

Act. Thus, the CPR rules did not provide for statutory remedies available under the 1991 Amendments, such as compensatory and punitive damages. Nevertheless, in his testimony Dirr insisted he was aware of the 1991 Amendments at the time he drafted the Hooters Rules.

Based on the preceding testimony. Phillips urges that Hooters tracked an outdated model arbitration agreement for termination disputes which was wholly inconsistent with expanded remedies available under the 1991 Amendments. Moreover. Phillips contends that Hooters consciously failed to provide remedies under its Rules notwithstanding its knowledge of passage of the 1991 Amendments. Phillips points to Hooters' own comparison of its rules to the CPR rules.[15] included in a table set forth as Exh. 1 to Hooters' April 14, 1997, filing entitled "Appendix to HOA's and HOMB's Reply to Defendant's and Counterclaim Plaintiff's Supplemental and Opposition Memorandum." Phillips points to numerous instances in which it contends Hooters consciously deleted CPR arbitration rules equitably drawn for both parties and adopted, without exception, rules favoring Hooters.

Phillips also contends that the Rules are fatally flawed based on the provisions for arbitrator selection alone. Phillips contends that in practical effect the Rules permit only Hooters to select arbitrators because Hooters controls the selection of individuals for the list of available arbitrators. Phillips also denies that the employee can simply reject each proposed list of arbitrators, asserting that the employee is limited to only one additional list. Be-

cause of the perceived unfairness in the arbitrator selection process and the absence of any requirement that arbitrators be impartial and independent of Hooters. Phillips asserts that Hooters is the judge of its own claim in arbitration.

As evidence that Hooters' Rules fall far outside the realm of conventional arbitration rules. Phillips points to several affidavits of arbitration experts[16] that unanimously proclaim Hooters' Rules to be unconscionable. For example, George Nicolau. President of the National Academy of Arbitrators, states unequivocally that the Hooters Rules "fall far short of the Protocol standards, that they are not fair to employees and do not afford adequate procedural protections, and, in contravention of the Protocol, do not afford employees the substantive rights to which they are entitled by law." Similarly, Lewis L. Maltby, member of the Board of Directors of the American Arbitration Association, opines that the Hooters Rules fail "to provide even minimally acceptable due process to employees. This is without a doubt the most unfair arbitration program I have ever encountered." In like vein Professor Dennis Nolan concludes that the Hooters Rules "do not satisfy the minimum requirements of a fair arbitration system."

To establish that Phillips lacked any meaningful choice in the execution of the arbitration agreements—an element generally considered an adjunct to unconscionability—Phillips relies on testimony from two former Hooters' employees. Messrs. Kulasa and Lamberjack. Lamberjack tes-

---

**15.** The table not only compares Hooters' Rules to the CPR provisions, but it also compares Hooters' Rules to the rules of the American Arbitration Association (AAA), the Federal Mediation and Conciliation Service (FMCS), the National Association of Securities Dealers (NASD), and the Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising out of the Employment Relationship. The Due Process Protocol is the product of a Task Force on Alternative Dispute Resolution in Employment, initiated by members of the Labor &

Employment Section of the American Bar Association. The full text of the Due Process Protocol is included as Exh. 1 to the Aff. of George Nicolau, President of the National Academy of Arbitrators, which is attached to Phillips' Notice of Filing Exhibits, filed March 21, 1997.

**16.** All of these are included in Phillips' March 21, 1997, filing entitled "Notice of Filing Exhibits."

tified that at a meeting with his assistant managerial staff on the day before the November 25, 1997, roll out, Gene Fulcher told his managers that if the employees refused to sign the employee arbitration agreement the managers should find a reason to get rid of them. Kulasa attended the same assistant manager's meeting and testified that he thereafter informed the Hooter's Girls that they needed to sign the arbitration agreement or they would lose their jobs. Phillips herself testified that she believed that if she did not sign the agreement management would find a way to get rid of her.

## 5. Voiding of Arbitration Agreement Based on Restrictions on Substantive Title VII Rights and Remedies

In this argument Phillips relies once again on the perceived restrictions on Title VII remedies and absence of due process imposed under the Hooters Rules. In arguing Phillips was forced to forgo substantive Title VII rights under the Rules, Phillips contends the Rules contain the following illegal restrictions:

1) Compensatory Damages. Rule 19-1, the Rules' damages provision, is silent as to compensatory damages, which are fully recoverable under the Civil Rights Act of 1991, 42 U.S.C. § 1981(a)(a), (b)(3).

2) Backpay Relief. HOA Rule 19-1 limits any backpay award by requiring that backpay be reduced for funds received from collateral sources. *i.e.,* unemployment compensation, disability benefits, which does not apply to judicial proceedings under Title VII.

3) Frontpay Relief. HOA Rule 19-1 and 19-2 limit any front pay award to a two year period.

4) Punitive Damages. Phillips contends that Rule 19-5 allows the arbitrators to award punitive damages up to a maximum of one year of gross cash compensation, which is approximately § 13,000, compared to the limit of $300,000 in punitive damages for unlawful employment discrimination available under 42

U.S.C. § 1981a(a), (b)(3), for joint employers of the size of HOA and HOMB.

5) Attorney's Fees. Phillips contends that Title VII attorney's fees and costs are traditionally awarded to a successful Title VII plaintiff under 42 U.S.C. § 2000e-5k, whereas under HOA Rules 19-1 and 20-1 attorney's fees can only be awarded upon a showing of frivolity or bad faith of the unsuccessful litigant.

6) Injunctive Relief. Whereas under Title VII an employer that intentionally engages in unlawful activity may be enjoined from continuing such conduct. 42 U.S.C. § 2000e-5(g)($l$), under Hooters Rule 2-6 the arbitration panel is precluded from awarding injunctive relief of any kind affecting Hooters policies or procedures ("[N]othing in these Rules shall be construed as to prohibit the company from enforcing any of its rules, regulations, policies or procedures") and Rule 8-9 ("[t]he Adjudication Panel shall not have the power to: (1) Modify or alter any policy of the Company, including any of these Rules....."). Moreover, Phillips points out that relief for the employer is not so limited, and that in cases brought by the employer the panel may award any relief that is "just and reasonable." which includes injunctive relief.

7) Burden of Proof. Rule 13-1 provides that in order for the employee to prevail on a claim, the employee must prove that Hooters' actions were "not proper, taking into account (a) the nature of the Employee's position and responsibilities, and (b) the Company's policies or procedures, including, without limitation, management directives." Thus, Phillips contends that Hooters' Rules alter the traditional Title VII burden that Phillips must prove an illegal action by a preponderance of the evidence by factoring in other extraneous considerations. such as whether the illegal action was a Hooters management directive or what Phillips' position was at the time of the incident.

8) Remedial Relief. Under Rule 19–7, the "remedial authority of the Adjudication Panel extends to the full scope of (a) the relevant state and federal statutory provisions, or (b) the scope of these Rules, whichever is less." Such provision is comparable to Rule 21–1(b), which provides that "the substantive law of the applicable local, state and federal statutes, rules, regulations and common law shall be applied by the Adjudication Panel, subject to the limits set forth in these Rules, as amended from time to time." Phillips contends such provisions authorize the arbitrators to disregard the law.

Thus, Phillips urges that arbitration should be denied and declared unenforceable as a matter of law where, as here, the Hooters Rules preclude Hooters' employees from claiming most of the rights and relief afforded by the federal employment discrimination statutes. Phillips argues that the Hooters Rules flout the Supreme Court's baseline requirement in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), that an arbitration agreement is enforceable only if it does not abridge statutory rights.

In addition, Phillips contends the Hooters Rules violate Title VII and public policy by failing to accord even the minimum guarantees of due process in the arbitration proceeding Several affidavits of Phillips' arbitration experts have compared the Hooters Rules to the Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising out of the Employment Relationship ("the Protocol"), developed by the Labor and Employment Section of the American Bar Association and adopted by the ABA and House of Delegates of the ABA, the American Arbitration Association, and the Federal Mediation and Conciliation Service. The Protocol is Exh. I to the Nicolau Declaration, attached to Phillips' Notice of Filing Exhibits. The Protocol sets forth only the minimum guidelines of due process. Phillips argues that the Hooters Rules fall far short of this minimum baseline standard.[17] In fact, Phillips points out that the several expert representatives of the arbitral community who reviewed the Hooters Rules and compared them to the Protocol each concluded that the Hooters Rules are so one-sided that they would refuse to arbitrate under them.

For example, after reviewing the Hooters Rules, Lewis Maltby, co-chair of the AAA National Advisory Committee on Employment Arbitration and a Director of the AAA, baldly asserted that "[t]his is without a doubt the most unfair arbitration program I have ever encountered." Maltby Dec. at Para. 6. Similarly, Professor Nolan opined that "I would decline to serve" on any arbitration panel bound by the Hooters Rules, and "[s]o would every other respected arbitrator I know." Nolan Dec. at 3. Mr. Nicolau flatly agreed that "I would not agree to arbitrate a matter under the HOA Rules as presently written and I would urge my colleagues to refuse to accept such assignments. I am also certain that reputable designating agencies, such as the AAA and Jams/Endispute, would refuse to administer a program so unfair and one-sided as this one." Nicolau Dec. at Para. 18. Mr. Friedman agreed that the AAA "would not administer a case filed under" the Hooters Rules. Friedman Dec.

All of the arbitration experts concluded that the most fundamental defect in the Hooters Rules is contained in Rule 8, which purportedly gives Hooters total control over the choice of the arbitrators. Because "one of the parties controls composition of the panel." the Hooters Rules are "contrary to the Protocol as well as the long-standing procedures of . . . responsi-

---

**17.** A tabular comparison of Hooters' Rules to rules used by several other arbitration providers, including the AAA, the National Association of Securities Dealers, the Federal Media- tion and Conciliation Service, and the Due Process Protocol, is attached as Exhs. 1–3 to Hooters' Reply, filed April 14, 1997.

ble designation agencies." Nicolau Dec. at Para. 11. "Company control over the source of the list of arbitrators materially deviates from the AAA Due Process Protocol." Friedman Dec., Exh. 1. "A procedure cannot be defined as arbitration without an impartial arbitrator or panel." Maltby Dec. at Para. 7(a).

Hooters Rule 8–7 provides for the arbitration panel to have three arbitrators: each party chooses one member and together, they choose the third arbitrator, who serves as the chair. Phillips insists that the familiar arbitral system of assuring fairness is subverted completely by Hooters' requirement that both the employee's own chosen arbitrator and the chair of the arbitral panel must be chosen from a list of "Approved Arbitrators" compiled and maintained solely by Hooters. Hooters Rule 8–1. Thus, Phillips charges that the Rules confer unbridled authority on Hooters to manipulate the composition of the panel, and to ensure that any decision maker is not a true, impartial arbitrator but rather, a carefully selected decision maker tied to Hooters.

Although Phillips contends that the total absence of any guarantee of arbitral impartiality in the selection process is the most egregious structural defect in the Rules because it infects all of the other procedural rules, she maintains that.

> [T]he HOA Rules are shot through from beginning to end with glaring deviations from the Protocol. These deviations, although perhaps not singly damning, create a cumulative burden of structural bias precluding Phillips from receiving a fair hearing and deterring others similarly situated from seeking to vindicate their rights against Hooters.

Defendant/Counterclaimant's Supplemental and Opposition Memorandum of Law, filed 3/24/97, at 14. These alleged deficiencies include the following provisions:

1) "Extra-territorial effect of Hooters' Rules." Hooters' Rule 4–1(a)(2), attempts to bind federal and state agencies such as the EEOC or the South Carolina Human Affairs Commission (SHAC) to adjudicate any claims filed with such agencies in accordance with Hooters' Rules.

2) Discovery limitations. Under Hooters' Rules 10–4, 10–7 & 10–2, Phillips is entitled to take only one deposition of a Hooters representative unless the arbitral panel drawn from the list of "Approved Arbitrators" grants broader discovery on a showing of substantial and demonstrable need. Thus, in the present case in which Phillips asserts claims against multiple defendants.[18] she is entitled to only one deposition. Plaintiff's expert Nicolau has opined that such limitation violates the Protocol and is "inappropriate in employment disputes." Nicolau Dec. at Para. 12.

3) Secrecy of Arbitration Results. Under Hooters' Rules. Rule 15–1, the proceedings are confidential and not to made publicly available. Phillips' experts, however, point out that such a provision gives Hooters an enormous advantage because, due to its regular appearance in Hooters' arbitrations, it has familiarity with the precedent and the arbitrators. Nicolau Dec. at Para. 15. In contrast, Phillips contends she has no access to such arbitration history.

4) One-sided Witness Disclosure. Hooters Rule 6 requires employees, but not Hooters, to divulge the identity, addresses, and summary of the testimony

---

**18.** Phillips' counterclaim is against both HOA and HOMB. In addition, Hooters has insisted throughout this litigation that any claim brought against the alleged harasser. Gerald Brooks, brother of Hooters' CEO, who does not appear to even be a regular employee of Hooters, but rather, has some relationship as its liquor licensing agent in South Carolina,

must also be brought in this arbitration proceeding. Thus, were Phillips to attempt to join Gerald Brooks in the instant proceeding she would be proceeding against three parties. Under Hooters' arbitration discovery rules, however, she would be entitled to only one deposition.

of all their witnesses as a prerequisite to filing such a claim, but no burden is imposed on Hooters. Moreover, there is no requirement that Hooters answer the claim initiated by the employee.

5) One-way Sequestration. Under Hooters Rule 13–5 the panel may order the sequestration of the employee's witnesses, but cannot require similar sequestration of Hooters' witnesses.

6) Hooters' Total Control over the Official Record. Under Hooters Rule 18–1 only Hooters can make the election to compile an audio or videotape record, or to make a verbatim transcript. Phillips argues that this provision empowers Hooters with effective control over any meaningful appellate review. Friedman Dec., Exh. 1.

7) Change of Rules without Notice. Under Hooters Rule 24–1. Hooters can unilaterally modify the Rules and attempt to bind the employees retroactively to such modifications. Phillips argues that theoretically such provision would allow Hooters to modify the Rules in the actual course of an arbitration proceeding should Hooters not like the way the proceeding was going.

8) Impairment of Judicial Review. Hooters Rule 17–4 provides that "the award shall be final and binding and not subject to review or appeal." A somewhat inconsistent provision, Rule 21–4, allows Hooters, but not the employee, to seek FAA § 10 review if "the Adjudication Panel has exceeded its remedial authority under these Rules." Thus, Phillips contends that she would have no right to judicial review under the Hooters Rules, which foreclose judicial scrutiny.

Although contending that the preceding provisions are only some of the more visibly one-sided provisions. Phillips sums up by arguing that the "HOA Rules stack the arbitration deck inalterably in Hooters' favor." She contends that to preserve scarce judicial resources, maintain minimum levels of arbitral integrity, and fulfill the FAA's purpose, this court must find, as a matter of law, that the Hooters Rules are unenforceable as violative of Title VII and due process.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO MAKING OF CONTRACT AND MISREPRESENTATION

The court, pursuant to Rule 52, FRCP, enters the following findings of fact and conclusions of law relative to the parties' making of an arbitration agreement and to Phillips' several allegations of fraud or negligent misrepresentation in the making of the agreement. As to the several contested factual matters relating to the making of the arbitration agreements, the court has had an opportunity to hear the testimony of the witnesses and to judge their demeanor and credibility. This section considers only those issues related to the parties intent to enter into an arbitration contract that covers Phillip's individual claim, and, assuming such contract was made, whether Phillips proved fraudulent inducement or negligent misrepresentation in the execution of the agreement. The remaining arguments for invalidating any arbitration agreement executed by Phillips, i.e., unconscionability, illusoriness, and public policy, are considered below in Section V. To the extent that any of the findings of fact represent conclusions or law, or vice-versa, they shall be so regarded.

1. In early 1994, HOA decided to implement an alternative dispute resolution program ("ADR") for all employees of Hooters. Adoption of such a program was prompted, in part, by Hooters' familiarity with the results of sexual harassment litigation in another state, and its desire to limit its exposure. Jim Dirr, HOA's General Counsel, drafted an initial ADR program, which was rejected in toto by the Board of Directors of HOA. He was instructed to go back and "start from scratch" in redesigning the ADR program.

2. The ADR program designed by Dirr and eventually adopted by HOA had three prongs: (a) the "open door policy," which was an informal consultation with a supervisor about a complaint; (b) the "compliance resolution procedure" (CRP), which involved the impanelling of a group of employees and managers to conduct peer review; and (c) an arbitration program, in which a third-party determined the result of claims made pursuant to the HOA Rules.

3. The exact confines of the three preceding programs are not altogether clear and it appears that some overlap existed. However, HOA determined that complaints of discrimination, harassment or wilful violations of the law could not be pursued in a CRP proceeding, but had to be addressed either by the "open door" or arbitration policies.

4. HOA scheduled an Atlanta meeting for the General Managers of its Hooters' restaurants on October 25–27, 1994, to introduce or "roll out" the ADR program. Hooters also introduced a new sexual harassment policy at this meeting. Gene Fulcher, then acting General Manager for HOMB, and Defendant Phillips' supervisor, attended the meeting and later followed the techniques presented at the meeting to roll out the ADR program to HOMB employees. Two key presenters at the meeting were Paul Schaefer, HOA's Director of Resources, and James Dirr. HOA's General Counsel. The parties have disputed what Mr. Schaefer represented to the General Managers concerning the fairness of the HOA ADR program, and its purported similarity to a procedure used by Marriott hotels. Suffice it to say that the court finds that Mr. Schaefer made statements to the effect that the ADR program was beneficial and fair. Mr. Schaefer also referenced the Marriott program, a program with which he was familiar through his prior work. Unknown to Schaefer, however, the HOA ADR program differed substantially from the Marriott program, which did not include an arbitration agreement and in which the results of any peer review were nonbinding. Ultimately, however, the inappropriateness of any analogy by Schaefer to the Marriott program is of no consequence because Phillips failed to prove that she was told this.

5. The General Managers were shown a number of transparencies of documents related to the ADR program and had several read aloud to them. One of the documents read aloud was a draft of the arbitration agreement eventually executed by Phillips. Joint Exh. 9. Paragraph 2 of the draft arbitration agreement, read aloud to the General Managers, specifically provided that claims of discrimination, sexual harassment, retaliation, or wrongful discharge, were subject to the arbitration agreement.

6. The draft arbitration agreement. Joint Exh. 9, contained several references to the "Rules," meaning the HOA arbitration rules. Although those Rules were still in draft form at the time of the October General Manager's meeting, it appears that one copy of the draft Rules was on site at the meeting. It does not appear, however, that anyone at the meeting, including HOMB's Fulcher, reviewed the Rules. The General Managers did not have the Rules read to them, and were not provided with their own copies of the Rules. No one at the roll out meeting stressed the importance of reviewing the Rules to the General Managers.

7. At some time prior to the actual roll out of the ADR program to Hooters employees at the various locations, the Divisional Vice–Presidents, to whom any request for copies of the Rules must be directed under the HOA Rules, received an updated employee manual along with a copy of the draft November 1, 1994, HOA Rules. See Joint Exh. 3.

8. Gene Fulcher used the procedure described at the General Managers' meeting in order to unveil the ADR program to HOMB employees on November 20, 1994.

Attending the meeting were approximately 20 Hooters Girls and numerous managers.[19] The meeting was noisy, as several employees had brought children. Although the meeting was to commence at 9:00 a.m., it did not get underway until nearly 9:30 a.m. The meeting ended before the 11:00 a .m. store opening. Employees were paid to attend the meeting, and timesheets of most employees show their attendance was for less than 2 hours. The agenda for the meeting. Joint Exh. 6, covered (1) the new employee handbook; (2) the HOA ADR program; and (3) employee benefits information.

9. The meeting began with a skit of the CRP peer review proceeding arising out of a minor disciplinary matter in which a waitress was "written up." Fulcher stuck to the procedure mandated at the Atlanta General Managers' meeting for the employee roll out by reading verbatim the following documents: (1) Joint Exh. 7. an explanation of the Open Door/CRP/Arbitration Programs: (2) Joint Exh. 12, the model arbitration agreement; and (3) portions of the employee handbook describing the ADR processes, see Joint Exh. 8. The handbook also informed the employees of how they could request a copy of the HOA arbitration Rules. The Rules referenced in the arbitration agreement were not, however, on site at the employee meeting. The parties dispute what Fulcher told the employees concerning the fairness of the arbitration proceedings, and the court finds that Fulcher told the employees the arbitration program was comparable to going to court, was fair and used impartial arbitrators. The arbitration agreement specifically states that it does not limit an employee's right to consult with an attorney, and the court finds that Fulcher told the employees they could consult with an attorney before signing the agreement. The court credits Ms. Pauley's testimony that upon Fulcher's direction she consulted with an attorney, a relative, prior to executing the agreement.

10. Fulcher told the employees they would have to sign an acknowledgment that day showing their receipt of the arbitration agreement. He also said that five days later, or the first day thereafter they were to be on duty, they would have to meet with him and sign the arbitration agreement or they would be unable to receive future job changes with Hooters. Phillips signed an acknowledgment on November 20, and the agreement itself on November 25, 1994. Joint Exh. 1. Although Phillips disputed whether she ever returned on a second occasion to execute the agreement (claiming instead that she, along with several others, may have postdated the agreements), the court finds that the HOMB employees were required to hold the documents five days before execution. The court finds that Phillips had no specific recollection of the details of the execution of her arbitration agreements and therefore was unable to give credible affirmative evidence that the agreement had not been held the requisite waiting period. In contrast, two other employees. Ms. Willette and Ms. Pauley, testified credibly that they were made to hold the document for five days before signing. Accordingly, the weight of the testimony bears out that Phillips was given a five day period in which to review the arbitration agreement before she executed it on November 25, 1994, which was the day after the Thanksgiving holiday.

11. Phillips attempted to prove that if she had not agreed to sign the arbitration agreement she would have been fired. The court cannot credit this testimony. In the first place. Phillips never identified any specific manager who told her that. At most, she indicated that it was her subjective belief that one would not be put on the schedule to work if one did not sign the arbitration agreement. Although

---

19. The managers attending the meeting included the General Manager, assistant General Manager, several departmental managers, and several managers-in-training who were assigned to HOMB at that time.

Messrs. Kulasa and Lamberjack testified that Fulcher had told the assistant managers that they should find a way to get rid of any employee who refused to sign the agreement, no evidence shows Phillips was aware of Fulcher's statement, even if it is believed. No evidence was introduced that any Hooters employee had ever been fired for declining the arbitration program. In fact, the only evidence presented on the issue was that in Baltimore, Maryland, where five to ten employees refused to execute arbitration agreements, no employees lost their jobs or suffered retaliation. (Watson Depo. at 18, 110–11).

12. When Chris Watson became the HOMB General Manager he determined to have employees bring their paperwork up-to-date. He asked Phillips to sign another arbitration agreement, telling her it was the same as the one she had previously executed. On April 23, 1995, Phillips signed a new arbitration agreement, which was identical to the one previously executed, and a waiver of jury trial right form.[20] See Joint Exh. 2.

13. Notwithstanding the extensive preparations made for the HOA ADR roll out, it is apparent to the court that numerous Hooters managers were grossly misinformed about the ADR program. For example, Messrs. Schaefer, Fulcher, Watson and Kulasa all displayed a fair degree of ignorance concerning the operation of the ADR program. Some of this confusion may have resulted from the language of the ADR documents themselves, which inconsistently use the terms "ADR." "peer review." "CRP." "open door." and "arbitration." The net result is that most of Hooters' own managers appeared to have little comprehension of the HOA ADR program ("ADR" being an umbrella term in this order encompassing all three prongs:

in contrast, ADR in the HOA literature often refers only to arbitration). As illustration, Mr. Schaefer, the former Human Resources Director, had never read the HOA Rules and was totally uninformed about their contents or had little grasp of arbitration. Mr. Fulcher thought the non-existent "United States Board of Arbitrators" were to act as arbitrators under the HOA arbitration program. Both Messrs. Watson and Kulasa did not appear to understand the parameters of CRP and arbitration, thinking that arbitration was simply an appeal of an unsatisfactory CRP result. In fact, under the HOA scheme CRP matters were not subject to the HOA arbitration program at all. With the misunderstanding of the HOA ADR program so apparent even among managers, the court is not surprised that Phillips herself did not appear to have a firm grasp of the distinctions between open door, CRP, and arbitration. She testified that all she remembered about the meeting was the skit of the CRP procedure, and she was unaware she was executing an arbitration agreement or foregoing statutory rights, remedies, or a judicial forum. Although doubtless the documents read aloud to Phillips at the HOMB meeting in November 1994 could have been more artfully drafted, the documents alerted a reasonably prudent employee that she was agreeing to arbitrate Title VII claims.

14. The court has carefully considered Phillips' arguments that the parties did not make an arbitration agreement based on the absence of the HOA Rules and complete lack of discussion of the substantive content of the Rules at the employee meeting.[21] The court finds that the Rules were still in somewhat of a draft stage at the time of the November 20, 1994, meeting,

---

**20.** The jury trial waiver form had been abandoned by HOA at that time, but Watson inadvertently had Phillips and other employees sign the form.

**21.** In addition, it was undisputed that at the Atlanta General Managers' meeting no discussion of the substantive content of the Rules was held, nor were the managers given copies of the Rules to take back with them. Thus, even if the HOMB employees had asked questions concerning the Rules, management at the site would have been unable to answer them.

but that would not have precluded their inclusion at the November 20, 1994, meeting. In fact, a draft copy of the Rules *had* been on site at the General Managers' meeting in Atlanta the preceding month. The question then arises as to why the Hooters arbitration Rules were not available on site at the employee meeting, or, preferably, handed out with the other disseminated materials. Based on the testimony at trial and the substance of the Rules, the court finds that Hooters' failure to distribute the Rules to the employees along with the other materials is circumstantial evidence that HOA knew that the employees would likely object to the unconscionability of the terms of the Rules if they were disclosed.[22] This is troubling to the court.

On the one hand, it is patently clear to the court based on evidence concerning the presentation of the ADR program at the employee meeting and the language of the arbitration agreement itself that Phillips knew and intended to enter into an arbitration agreement. Thus, Phillips had a meeting of the minds with Hooters as to waiver of her jury trial rights in an arbitration forum. On the other hand, it is equally clear to the court that nothing in the arbitration agreement or presentation at the meeting would have alerted, signaled or given notice to any HOMB employee that by signing the arbitration agreement the employee was, in fact, waiving important substantive rights under Title VII, such as certain damages remedies.

The court sustains Hooters' position as to the actual making of the arbitration contract, and finds the parties had a meeting of the minds on that narrow issue. Phillips was aware of and intended to enter into an arbitration agreement: in fact, the arbitration agreement was read aloud verbatim to her.[23] However, the court cannot find that the parties had a meeting of the minds on Phillips' waiver of several other important statutory rights, especially where, as here, there appears to have been an effort to conceal the content of the Rules.

15. Because arbitration is entirely a creature of contract, the court's initial inquiry was to determine whether the parties properly entered into a "valid" (ignoring the unconscionability and public policy defenses asserted by Phillips, which are considered in Section V, below) arbitration agreement. 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Under the FAA, the party seeking arbitration must first show a written agreement for arbitration; then, the court must assess whether there are "grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

■ Here, no dispute exists concerning the existence of the written arbitration agreement. The question is whether the absence of alleged essential terms (the Rules) at the roll out meeting invalidated the entire contract, and/or whether Phillips proved fraud in the inducement. In order to have a valid and enforceable contract, there must be a meeting of the minds between the parties with regard to all the essential and material terms of the agreement. *Player v. Chandler,* 299 S.C. 101, 382 S.E.2d 891, 893 (1989). In the orthodox situation the content of arbitration rules would not constitute a material term of the agreement because such rules would

---

**22.** Moreover, the fact that the arbitration agreement specified a rather cumbersome method in which an employee could submit a written request for a copy of the Rules is further evidence of HOA's intent because HOA would expect few, if any, employees to request the Rules. As it was, no HOMB employee requested a copy of the Rules.

**23.** The court is aware that it is not atypical for an arbitration agreement to incorporate by reference a specified set of procedural rules, *i.e.,* AAA or NASD rules, without appending those rules to the agreement itself, and for the agreement to be nevertheless fully enforceable. The court, however, finds the present Rules substantially distinguishable from those types of arbitration rules, which do not waive substantive statutory rights.

address merely procedural matters of the forum. Here, however, because the HOA Rules waived important statutory rights, the court finds the Rules were essential and material terms of the arbitration agreement. In the absence of a meeting of minds on those issues, the court finds no enforceable arbitration contract.

■ 16. The court must nevertheless reject Phillips' claims of fraudulent inducement in the execution of the contract, or negligent misrepresentation. It is hornbook law that the common law tort of fraud requires nine essential elements:

(1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

M.B. *Kahn Constr., Co. v. SCNB*, 275 S.C. 381, 271 S.E.2d 414 (1980). The court finds that Phillips has failed to prove an actionable false representation by Fulcher at the roll out. At most, Fulcher may have likened Hooters arbitration to going to court, described the process as "fair," or read aloud the handbook arbitration provisions stating that arbitrators were impartial decisionmakers. However, Phillips failed to show Fulcher's knowledge of the falsity of the statements. Phillips has not shown that such statements were anything more than nonactionable opinion statements by Fulcher, which he believed to be true. *See Cooke v. Allstate Mgt. Corp.*, 741 F.Supp. 1205 (D.S.C.1990) (landlord's statement that apartment was "safe" was expression of opinion rather than fact); *Goodwin v. Dawkins*, 282 S.C. 40, 317 S.E.2d 449 (1984). Similarly, Phillips failed to show Fulcher knew that the arbitrators would not be impartial, especially where, as here, Fulcher testified at the hearing that he himself has never read the Hooters' Rules.

■ Moreover, even *assuming arguendo* that Fulcher made false representations, Phillips had no right to rely on them when the truth of his representations—concerning the fairness of the procedure or the impartiality of the arbitrators under the HOA scheme—would have been evident by an inspection of the Rules. One cannot complain of fraud in the misrepresentation of the contents of written instruments signed by him when the truth could have been ascertained by reading the instrument, since one entering into the written contract should read it and avail himself of every opportunity to understand its content and meaning. *O'Connor v. Brotherhood of R.R. Trainmen*, 217 S.C. 442, 60 S.E.2d 884 (1950). Finally, the court rejects Phillips' contention that Fulcher represented to Phillips that the entire essential agreement was before her. The arbitration agreement as well as the handbook provisions read aloud governing the ADR program expressly referenced the Rules and informed Phillips of how she could obtain a copy of them from a Divisional Vice–President. Accordingly, based on the above, the court finds no persuasive evidence establishing fraudulent inducement of the arbitration agreements executed by Phillips.

■ 17. In South Carolina, parties to a fiduciary relationship must fully disclose to each other all known information that is significant and material, and when the duty to disclose is triggered, silence may constitute fraud. *Anthony v. Padmar, Inc.*, 320 S.C. 436, 465 S.E.2d 745 (App. 1995). Phillips contends Hooters' failure to provide a copy of the Rules or emphasize their importance at the roll out constituted fraudulent concealment. The court rejects this claim. An employer/employee relationship is not a fiduciary relationship upon which a fraudulent concealment action could spring. "A fiduciary relationship cannot be established by the unilateral action of one party." *Steele v. Victory Savings Bank*, 295 S.C. 290, 368 S.E.2d 91, 95 (App.1988). Phillips produced no evi-

608

dence that Hooters intended to create a fiduciary or confidential relationship with her, and therefore Hooters had no duty under South Carolina tort law to disclose all significant terms.[24] Thus, Phillips' fraud claim is without foundation.

■■■■■ 18. Phillips also claimed coercion in the execution of the instruments. In *Gomillion v. Forsythe*, 218 S.C. 211, 62 S.E.2d 297, 302 (1950), the South Carolina Supreme Court stated that:

> Coercion of the character considered is in the nature of fraud, because it means the exercise of such importunity and urgency of persuasion, or overpersuasion, as it is sometimes called, as to destroy the free agency of the party sought to be coerced, and to prompt him or her to do what is really against his or her will. In other words, it must be such as to take away the free agency of the party sought to be coerced and substitute the will of another in the place of his or her own. This is what is sometimes called moral coercion, and is practically synonymous with undue influence.

Applying the foregoing definition to the facts, the court concludes that Phillips has failed to prove coercion under South Carolina law. The court has found above that Fulcher explained that the employees were free to accept or reject the arbitration agreement, were invited to consult a law-

yer, and held the documents the requisite number of days. The court does not find that the fact that an employee refusing to sign the agreement had to forgo future promotions proves, by itself, a wrongful act of coercion in the absence of other evidence showing a destruction of the employee's free agency. Accordingly, the court finds no coercion.[25]

19. For the preceding reasons, the court also finds Phillips failed to establish either constructive fraud or negligent misrepresentation, which do not require proof of intent to misrepresent. Even assuming false statements were made, Phillips failed to establish that she had a right to rely on Fulcher's alleged statements of fairness and arbitrator impartiality given that the truth of such representations could have been discovered by her if she had requested and reviewed the Rules herself, or had counsel review them.

## V. CONCLUSIONS OF LAW ON UNCONSCIONABILITY AND PUBLIC POLICY

### A. FAA Principles

#### 1. Generally

■■■■■ The purpose of the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, is to reverse the previous common law judicial hostility to arbitration agree-

24. Note, however, that the question whether Hooters had a duty to disclose all material terms under South Carolina tort law is an entirely different question from whether, in order to ensure their employees' waiver of substantive statutory rights was knowing and voluntary. Hooters should have revealed the contents of the Rules at the roll out meeting. Whereas the court finds that the answer to the first question is "no," the answer to the second question is "yes ." *See generally* discussion at Section V.B.2, *infra* regarding the showing necessary for a waiver of substantive statutory rights.

25. A related doctrine is the doctrine of economic duress, for which the elements are: (1) the coerced party must show that he has been the victim of a wrongful or unlawful act or threat; (2) that such act or threat must be one

which deprives the victim of his unfettered will; (3) as a direct result the coerced party must be compelled to make a disproportionate exchange of values or give up something for nothing; (4) the payment or exchange must be made solely for the purposes of protecting the coerced party's business or property interests; and (5) the coerced party must have no adequate legal remedy. *Troutman v. Facetglas, Inc.*, 281 S.C. 598, 316 S.E.2d 424 (App.1984). The court finds no evidence of economic duress in the complete absence of evidence showing a wrongful or unlawful act or threat. Forfeiting future promotions upon a refusal to sign an arbitration agreement does not constitute a wrongful threat nor does it prove improper pressure overcoming Phillips' volition. *Phillips v. Baker,* 284 S.C. 134, 325 S.E.2d 533, 535 (1985).

ments and to place them on the same grounds as other contracts. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). The FAA represents "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone*, 460 U.S. at 24–25, 103 S.Ct. 927. The FAA's general enforcement provision, 9 U.S.C. § 2, provides that:

> A contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon the grounds as exist at law or in equity for the revocation of any contract.

Section four of the FAA allows the court to compel arbitration when one party fails to comply with an arbitration agreement and section three allows a district court to issue a stay when an issue is referable to arbitration. Two further provisions, 9 U.S.C. §§ 10 and 11, set forth extremely narrow grounds for a district court to refuse to confirm arbitral decisions.

### 2. Substantive arbitrability inquiry

█ Whether granting an order to arbitrate under section 3 or section 4, the district court must first determine if the issues in dispute meet the standards of "substantive arbitrability" or "procedural arbitrability." *Glass v. Kidder Peabody & Co., Inc.*, 114 F.3d 446 (4th Cir.1997). A substantive arbitrability inquiry confines the district court to considering only those issues relating to the arbitrability of the issue in dispute and the making and performance of the arbitration agreement. *Id.* at 453. In other words, under the

substantive inquiry the court looks to see that a valid arbitration agreement exists between the parties and that the specific dispute falls within the substantive scope of the agreement. *Id.* In contrast, all other issues raised before the court not relating to the two prior determinations, fall within the ambit of "procedural arbitrability," and are within the jurisdiction of the arbitrator. *Id.* Here, Phillips has raised numerous substantive arbitrability questions concerning the validity of the arbitration agreements. Thus, these are matters within this court's jurisdiction under the FAA.

### 3. Section 1 Exemption

█ As a threshold objection to arbitration, Phillips asserts that she is exempt from arbitration because her Hooters employment fell within the Federal Arbitration Act (FAA) " § 1 exemption." The FAA exempts from its coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The Fourth Circuit, following the precedent of several other circuits, has extended a narrow reading to this exemption, interpreting it to mean that only employees engaged in the shipment and transportation of goods are covered by the exemption. *O'Neil v. Hilton Head Hosp.*, 115 F.3d 272 (4th Cir.1997). Accordingly, this court rejects Phillips' contention and finds her argument foreclosed by *O'Neil.*

### 4. Test for Motion to Compel Arbitration

In addressing a motion to compel arbitration, a court is required to apply a multi-pronged test (hereinafter "the *Genesco* test"):

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether

Congress intended those claims to be nonarbitrable;.... [26]

*Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987); *Reese v. Commercial Credit Corp.,* 955 F.Supp. 567 (D.S.C.1997). In the present case, no serious debate exists as to the second prong concerning the scope of the agreement, *i.e.,* whether the broadly-written arbitration clause covers Phillips' sexual harassment claim. However, Phillips challenges the first and third elements of the *Genesco* test to compel arbitration. As to the first prong, she claims that because of several deficiencies in the Hooters roll out program, she and Hooters never entered into a valid arbitration agreement. As to the third prong, she contends that Congress did not intend to authorize arbitration of Title VII claims where, as here, substantive rights are allegedly waived pursuant to the agreement.

## B. The State Law Inquiry Whether the Parties Agreed to Arbitrate

### 1. Generally

 Arbitration is a matter of contract and controlled by contract law. *South Carolina Public Serv. Auth. v. Great Western Coal, Inc.,* 312 S.C. 559, 437 S.E.2d 22 (1993). An arbitration agreement is treated like any other contract. *Kresock v. Bankers Trust Co.,* 21 F.3d 176, 178 (7th Cir.1994). In determining whether a valid arbitration agreement arose between the parties, a federal court should look to the state law that ordinarily governs the formation of contracts. 9 U.S.C. § 2; *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). In the present case, because South Carolina was the situs of all relevant events pertinent to Phillips' execution of the arbitration agreements, the court looks

to the contract law of that state. *First Options,* 514 U.S. at 944, 115 S.Ct. 1920.

### 2. Elements of an Agreement

"Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Arrants v. Buck,* 130 F.3d 636 (4th Cir.1997). Courts decide whether there is an agreement to arbitrate according to common law principles of contract law. *Id.* Under South Carolina law, in order for there to be an agreement, there must be a meeting of the minds of the parties. *Gaskins v. Blue Cross–Blue Shield of South Carolina,* 271 S.C. 101, 245 S.E.2d 598, 600 (1978). An "agreement" has been defined as:

> [A] Concurrence and an engagement that something should be done or omitted. It is a coming together of the parties in an opinion or determination, the union of two or more minds in a thing done or to be done, a mutual assent to do a thing,....

*Gaskins,* 245 S.E.2d at 600.

Phillips contends the higher showing necessary under federal substantive law for a "knowing and voluntary" waiver of a substantive right ought to apply here. Phillips argues that she did not enter into the arbitration agreements in a knowing and voluntary manner, that there was no meeting of the minds, and that the agreements are therefore unenforceable. She argues that Hooters cannot meet the heavy burden of showing a knowing and voluntary agreement to "waive" a substantive right.

Some courts have found that a higher "knowing and voluntary" standard should apply to contracts waiving substantive rights. *See, e.g., Puentes v. United Parcel Service Inc.,* 86 F.3d 196, 198 (11th Cir. 1996) (considering whether release of Title

---

**26.** Some courts add a fourth-prong, which is "whether, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending

arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.,* 815 F.2d 840, 844 (2d Cir.1987). Because the court finds that none of Phillips' individual claims are arbitrable, this fourth prong has no relevance to the case at hand.

VII and 42 U.S.C. § 1983 claims were knowing and voluntary). *Puentes* applied *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 571 (7th Cir.1995), which found that a knowing and voluntary standard applied to the release of age and race discrimination claims. *See also Gonzalez v. County of Hidalgo*, 489 F.2d 1043, 1046–47 (5th Cir.1973) (contractual waiver of a constitutional right). Indeed, because Title VII now requires a jury trial, there is a serious question whether the rights at stake are constitutionally based, i.e., the Seventh Amendment right, underscoring the need for a "knowing and voluntary" standard for the waiver of such rights. The ADEA requires such a standard, 29 U.S.C. § 626(f), and the question is whether such a standard ought to apply to Phillips' case.

The leading case on this point in the arbitration context is *Prudential Ins. Co. v. Lai*, 42 F.3d 1299 (9th Cir.1994), *cert. denied*, 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995). There, the Ninth Circuit stated:

> Congress intended there to be at least a knowing agreement to arbitrate employment disputes before an employee may be deemed to have waived the comprehensive statutory rights, remedies and procedural protections prescribed in Title VII and related state statutes.

*Id.* at 1304. In another case the Ninth Circuit found that an employer's unilateral promulgation of mandatory arbitration provisions in an employee handbook did not produce a "knowing" waiver even though the employee, like Phillips, acknowledged receiving the handbook and agreed in writing to read and understand it. *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756 (9th Cir.1997).

*Lai* and its progeny, of course, are not binding precedent on this court, and the court notes that several courts have declined to follow *Lai*, reasoning that it ignores principles of *Gilmer* and core contract law. *E.g., Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 957 F.Supp.

1460 (N.D.Ill.1997); *Johnson v. Hubbard Broadcasting, Inc.*, 940 F.Supp. 1447 (D.Minn.1996); *Beauchamp v. Great West Life Assur., Co.*, 918 F.Supp. 1091 (E.D.Mich.1996).

The Supreme Court has indicated that an employee could not forfeit substantive rights under Title VII absent a voluntary and knowing waiver. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 51–52 n. 15, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Court has not reached the issue of the standard applicable to the waiver of the right to litigate one's Title VII claims in federal court. *Gibson v. Neighborhood Health Clinics*, 121 F.3d 1126, 1129 (7th Cir.1997). In *Gilmer*, the Court (in dicta) stated that in agreeing to arbitrate a federal claim, a party "does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer*, 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (internal quotations omitted)).

The Fourth Circuit has not addressed the question whether a knowing and voluntary waiver is required for an agreement to arbitrate a Title VII claim. Only the Ninth Circuit in *Lai* specifically reached the issue. The Eighth Circuit in *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 834 (8th Cir.1997), applied ordinary contract principles in determining whether an employee had agreed to submit Title VII claims to arbitration. The Seventh Circuit in *Gibson* noted that, "[o]bviously, the strongest case for a court's finding that an employer and employee agreed to submit claims to arbitration will arise when the record indicates the employee has knowingly agreed to do so." 121 F.3d at 1129.

Assuming *arguendo* that a knowing and voluntary standard applies to Phillips' execution of an arbitration agreement that waived substantive statutory rights, the

court would agree that Phillips' acquiescence did not satisfy that criteria. At a minimum, if such standard applied, Phillips would have had to be informed of the substantive statutory rights which she was waiving. That information was in the HOA Rules, which indisputably were absent from the site and not discussed orally.

There is serious doubt whether such waivers of substantive statutory rights in an arbitration agreement, even if knowing and voluntary, can ever be valid. *Gilmer* approved arbitration in lieu of litigation based on the assumption that the party agreeing to arbitrate "does not forgo the substantive rights afforded by the statute." 500 U.S. at 26, 111 S.Ct. 1647 (quoting *Mitsubishi*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444). Although *Alexander v. Gardner–Denver* recognized that a waiver of substantive rights under Title VII could occur, it was not in the context of a predispute arbitration agreement.

On the other hand, if ordinary contract principles apply here, Phillips' claim that she did not knowingly sign the arbitration agreement is to no avail. Under South Carolina law, one entering into a written contract should read it and avail himself of every reasonable opportunity to understand its contents and meaning. *Maw v. McAlister*, 252 S.C. 280, 166 S.E.2d 203 (1969). A party cannot complain of fraud or misrepresentation in the contents of a contract if the truth could have been ascertained by reading it, except where the party is "ignorant and unwary." *Burwell v. South Carolina Nat'l Bank*, 288 S.C. 34, 340 S.E.2d 786 (1986). It is undisputed that Fulcher read and discussed the arbitration agreement at the roll out, and explained that the employees were required to acknowledge the form, which Phillips did. The parties clearly had a meeting of the minds regarding entering into an arbitration agreement, although undeniably the Rules were not revealed to Phillips at the roll out meeting. Under such an interpretation Phillips, an intelligent and articulate young woman, is presumed to know the contents of the documents under South Carolina law based on her assent to the arbitration agreement.

 After extended study of the question, the court concludes that on the unusual facts of this case it was incumbent on Hooters to show that Phillips' waiver of several important substantive statutory rights was "knowing and voluntary." The court rests its conclusion on the mandate of *Alexander v. Gardner Denver*, which holds that an employee cannot forfeit substantive rights under Title VII absent a knowing and voluntary waiver, and the foundational premise of *Gilmer* that an arbitral forum was merely a change in forum and not in substantive rights. Here, enforcement of the HOA arbitration agreement and Rules effects a drastic change to several of Phillips' substantive statutory rights, and therefore, assuming Phillips could waive such rights, at a minimum Hooters had the burden of proving her knowing and voluntary agreement to each of those terms. Hooters cannot satisfy such a showing because of the undisputed absence of the Rules from the roll out meeting. Accordingly, the court finds that the parties did not enter into a satisfactory agreement to arbitrate.

### 3. Other Validity Challenges under State Law

Although the federal arbitration statute, 9 U.S.C. § 4, speaks only of challenges to the "making" of the agreement to arbitrate, the term encompasses any challenge to the validity of the agreement, even if there is no disagreement that it was "made." *Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866 (7th Cir.1985). Here, Phillips has raised state law contract defenses of unconscionability, fraud, coercion, and public policy violations to the validity and enforcement of the arbitration agreement.

### 4. Fraudulent Inducement as a Matter for Federal Court Resolution

 Under South Carolina arbitration law, the duty to arbitrate under an arbitra-

tion clause in a contract survives termination of the contract. *Jackson Mills, Inc. v. BT Capital Corp.*, 312 S.C. 400, 440 S.E.2d 877 (1994). South Carolina courts, following the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), have held that to avoid the arbitration of the contract itself, a party seeking to avoid arbitration had to make an allegation of fraud in the inducement of the arbitration clause; fraud as a defense to the arbitration clause had to be fraud specifically as to the arbitration clause and not to the contract generally. *South Carolina Public Serv. Auth. v. Great Western Coal Inc.*, 312 S.C. 559, 437 S.E.2d 22 (1993). In the present case, however, the agreement to arbitrate, with the incorporated Rules, is the entire contract. The Hooters handbook, given out contemporaneously with the arbitration agreement on November 24, 1994, expressly stated that Phillips was an at-will employee, and no contract of employment existed. Thus, Phillips' claim of fraud in the inducement goes to the making of the entire agreement to arbitrate. Under the rule of *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), this is a matter for the federal court to decide, and not the arbitrator. For the reasons set forth above in Section IV, however, the court finds that Phillips has failed to prove fraudulent inducement or coercion by the preponderance of the evidence.

### 5. Unconscionability

■ "Although the Federal Arbitration Act manifests a liberal federal policy favoring arbitration agreements, and questions of arbitrability must be addressed with regard for the policy, the Act leaves the interpretation of an agreement to the application of common law principles of contract law." *Whiteside v. Teltech Corp.*, 940 F.2d 99 (4th Cir.1991). Moreover, an "[a]rbitration provision's scope and meaning is for the court to resolve." *Brown v. Trans World Airlines*, 127 F.3d 337 (4th Cir.1997). Here Phillips asserts that interpretation of the Hooters arbitration agreement and Rules proves they are an unconscionable contract of adhesion, and therefore, unenforceable as a matter of common law contract law. Hooters disputes Phillips' interpretation of some of the Rules provisions, which has compelled this court to undertake the perplexing task of interpreting the agreement and Rules provisions.

■ Whether a contract or a provision of a contract is unconscionable is a question of law. *Wingard v. Exxon*, 819 F.Supp. 497 (D.S.C.1992). Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party. *Id.* at 502. In other words. "[a]n unconscionable bargain is one which 'no man in his sense and not under delusion would make on the one hand, and ... no honest and fair man would accept on the other.'" *Hume v. United States*, 132 U.S. 406, 411, 10 S.Ct. 134, 33 L.Ed. 393 (1889) (quoting *Earl of Chesterfield v. Janssen*, 28 Eng. Rep. 82, 100 (1750)).

■ Unconscionability is measured at the making of the contract, and the test is "whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 450 (D.C.Cir. 1965). In applying South Carolina's unconscionability principles, the Fourth Circuit has recognized that a court should consider the circumstances of the case, and principles of equity, oppression, and unfair surprise to conclude whether "the clauses involved are so one-sided as to be unconscionable" at the time the contract was formed. *Coker Int'l, Inc. v. Burlington Industries, Inc.*, 935 F.2d 267, 1991 WL 97487 (4th Cir.1991) (quoting *Jones Leasing, Inc. v. Gene Phillips & Assoc.*, 282 S.C. 327, 318 S.E.2d 31, 33 (App.1984)).

The Fourth Circuit has also isolated six factors relevant to an unconscionability inquiry: (1) the nature of the injuries suffered by the party sought to be held to the contract; (2) whether that party is a substantial business concern; (3) disparity in the parties' bargaining power; (4) the parties' relative sophistication; (5) whether there is an element of surprise in the contract's terms; and (6) the conspicuousness of the terms. *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir.1989). However, the "mere fact that one party to a contract is larger than the other cannot be the basis of a finding of unconscionability of an arbitration clause in a contract." *Stedor Enter., Ltd. v. Armtex, Inc.*, 947 F.2d 727 (4th Cir.1991).

■ A contract of adhesion is generally thought of as a standard form contract offered on a "take-it-or-leave-it" basis, with its terms being nonnegotiable. *Wingard,* 819 F.Supp. at 503. In *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 599, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991), the Supreme Court explained, "the common law ... subjects terms in contracts of adhesion to scrutiny for reasonableness." It continued:

> Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all of the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld.

*Id.* (citations omitted). For an arbitration provision to be stricken as a contract of adhesion, there must be a showing of unfairness, undue oppression or unconscionability. *Threlkeld & Co. v. Metallgesellschaft, Ltd.*, 923 F.2d 245, 248 (2d Cir.1991).

■ Having considered the testimony adduced at the evidentiary hearing concerning the commercial setting, purpose and effect of the arbitration agreement, and other evidence offered by the parties, the court finds that, as a matter of law, the Hooters arbitration agreement and incorporated Rules are "unconscionable."

Applying the six specific considerations isolated in *Carlson* yields the inevitable conclusion that the multiple one-sided provisions in the Hooters Rules are unconscionable. Here, the injuries suffered by Phillips are substantial in that under the agreement she has been stripped of her right to a judicial forum for a Title VII violation and, more important, she has been stripped of numerous substantive remedies under Title VII. For example, her rights to compensatory damages, backpay relief, frontpay relief, punitive damages, and attorney's fees are either eliminated or substantially curtailed under the Hooters damages provisions, Rule 19–1. Even the burden of proof on Phillips in the arbitral scheme is higher than it would be if she had a judicial forum, because the arbitrator is to consider "the company's policies or procedures ... and management directives" in determining whether a violation of Title VII occurred. Rule 13–1. Moreover, she has also been injured by the imposition of numerous unfair procedural rules that she would not be faced with in court. For example, just to name a few provisions, she has acceded to Hooters acting as the sole gatekeeper to the list of "Approved Arbitrators" (Rule 8); she has acceded to severe discovery limitations (Rule 10–4. 10–7 & 10–2); she has acceded to one-way witness disclosure (Rule 6) and one-way witness sequestration (Rule 13–5); she has acceded to empowering Hooters with total control over the official record (Rule 18–1); and she has acceded to impaired, or sharply curtailed, judicial review under 9 U .S.C. § 10. These are, indeed,

severe injuries Phillips suffers if the Hooters agreement is enforced.

Here Phillips is not "a substantial business concern," but rather, is one employee employed by a rather large restaurant chain with facilities nationwide. There clearly is a marked disparity in the parties' bargaining power. Although Hooters denied vehemently that Phillips would have been fired for refusing to sign the arbitration agreement, and the court has credited that testimony, the court also finds that Phillips had been led to believe by certain mid-level managers that she would not have been put on the list for working until she executed the arbitration agreement. This meant Phillips would, for all practical purposes, have been unemployed unless she acceded to the agreement's terms, giving her no bargaining power. The parties' relative sophistication insofar as arbitration agreements was a wide gulf. Hooters had the ready services of General Counsel and outside counsel for over a year in drafting the arbitration program: in contrast, Phillips, who had no prior exposure to arbitration agreements, gathered her sole knowledge about arbitration from the roll out presentation. The court has previously found that the materials disseminated at the employee roll out muddled discussions regarding arbitration compliance review procedures and open door policy discussions. Hence, the HOMB presentation did not furnish the employees with a thorough understanding of HOA arbitration, even disregarding the critical absence of the Rules.

As to the two final *Carlson* factors, the court finds there was an extreme element of surprise to the harshness of the Rules, which were not on site at the time of the roll out. Moreover, although notionally Phillips could have asked in writing for a copy of the Rules, the court will not ignore the fact that the roll out occurred right before Thanksgiving, that Phillips was told she had five days to consider the matter, and that nothing in the agreement emphasized that the "guts" of the Hooters arbitral scheme was buried in the Rules. Finally, it is obvious that the conspicuousness of the Rules' harsh provisions is not a factor here because the Rules were not included in the roll out, and even the cursory reference in the agreement to the procedure to request a copy of the Rules did not emphasize the necessity for doing so.

The court has also weighed the testimony of the several arbitration experts,—— Messrs. Nicolau and Maltby, and Professor Nolan——all of whom opine that the Hooters arbitration scheme fails miserably to satisfy even the most basic requirements of a commercially reasonable arbitration scheme. The Hooters arbitral scheme is a spectacle of *Gilmer* gone mad. The court finds nothing in Supreme Court precedent dictating enforcement of arbitration in such bizarre circumstances. Further, principles of equity mandate that this agreement and Rules be deemed unconscionable and unenforceable.

### 6. Public Policy Violation

■■■■ South Carolina recognizes illegality, or public policy violation, as a defense to contract enforcement. The Supreme Court of South Carolina has stated:

> It seems to be well established in this State that contracts having for their object anything that is obnoxious to the principles of the common law, or contrary to statutory enactments or constitutional provisions, or repugnant to justice and morality, are void; and the Courts of this State will not lend aid to the enforcement of contracts that are in violation of the law or opposed to sound public policy.

*Standard Register v. Kerrigan,* 238 S.C. 54, 119 S.E.2d 533, 542 (1961) (citations omitted). Thus, an agreement is unenforceable "if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." *Town of Newton v. Rumery,* 480 U.S. 386, 392, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987). Whether an agree-

ment violates public policy is decided on a case-by-case basis. *Id.* In the context of reviewing arbitral awards, the Supreme Court has cautioned that, "there is no broad judicial power to set aside [an] arbitration award as against public policy." *United Pipeworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). Thus, public policy is implicated only where "it is explicit, well defined and dominant, and ascertainable by reference to the laws and legal precedents and not from the general consideration of supposed public interests." *L & E Corp. v. Days Inns of America, Inc.,* 992 F.2d 55, 58 (4th Cir.1993). "It is only because of the dominant public interest that one who ... has had the benefit of performance by the other party will be permitted to avoid his own promise." *Twin City Pipe Line Co. v. Harding Glass Co.,* 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112 (1931). An English jurist once described public policy as "a very unruly horse, and when once you get astride it you never know where it will carry you." *Naylor Benzon & Co. v. Krainische Industrie Gesellschaft.* [1918] 1 K.B. 331, 342 (citations omitted).

■ Upon consideration of the purposes and legislative history of Title VII and the 1991 Amendments thereto, the court finds that the Hooters arbitral scheme, which denied Phillips an effective and fair forum in which to vindicate her Title VII claim, is void on public policy grounds. In 1991, amendments to Title VII were added, which provided that, "where appropriate and to the extent authorized by law ... arbitration ... is encouraged to resolve disputes arising under" these laws. Pub.L. No. 102–166. ("§ 118"). Circumstances in which arbitration was "appropriate," as referred to in § 118, were well established by earlier caselaw.

The Supreme Court in *Gardner–Denver* emphasized the Congressional policy according the elimination of discrimination the highest priority. *Gardner–Denver,*

415 U.S. at 49, 94 S.Ct. 1011. Before *Gilmer,* courts had unanimously found that any waiver, including a knowing waiver, of statutory rights was precluded. In *Gilmer,* the Court established the baseline test that "[s]o long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent functions." 500 U.S. at 28, 111 S.Ct. 1647.

Nothing in the 1991 Amendments to Title VII manifests a change to the statute's original purposes. The Amendments created new substantive and procedural protections, guaranteed a jury trial, allowed compensatory and punitive damages, and created new rights in mixed motive situations. In explaining the import of § 118's reference to arbitration and other alternative dispute mechanisms, one House subcommittee report stated:

> [§ 118] encourages the use of alternative means of dispute resolution ... where appropriate and to the extent authorized by law.... The Committee emphasizes ... that the use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by Title VII. Thus, for example, the Committee believes that any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of Title VII. This view is consistent with the Supreme Court's interpretation of Title VII in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Committee does not intend this section [§ 118] to be used to preclude rights and remedies that would otherwise be available.

H.R.Rep. No. 40(I), 102nd Cong. 1st Sess. 1991, reprinted in 1991 U.S.C.C.A.N. 546, 635. To the extent that the Hooters arbitral scheme abridges Phillips' rights to full damages under the 1991 Amendments, and

full attorney's fees as allowed by a court under 42 U.S.C. § 2000e–5k, and to the extent that the Hooters arbitral scheme imposes a procedurally unfair forum, the court finds the entire arbitral agreement and Rules void as a matter of public policy. The HOA arbitral scheme supplants numerous well-defined, dominant Title VII policies. Refusing to enforce arbitration is such circumstances is fully consistent with the express terms of the '91 Amendments ("where appropriate"), the *Gilmer* decision (party must be able to vindicate statutory claim fully in arbitral forum), and the legislative history to the '91 Amendments (§ 118 not to preclude rights and remedies otherwise available).

### 7. Illusory Promise

Phillips also challenges the arbitration agreement's validity on the separate ground that the agreement and Rules are illusory. Because in the present case no new consideration in tangible benefit (cash, a promotion, etc . . . ) was advanced at the time of execution of the arbitration agreement, the question becomes whether the parties exchanged mutually binding promises that could serve as adequate consideration. It is hornbook contract law that in order for a promise to be enforceable against a promisor, the promisee must have given some consideration for the promise. E.A. Farnsworth, *Farnsworth on Contracts* § 2.2 at 61 (1990). An illusory contract is also regarded as "an apparent promise which makes performance optional with the promisor . . . is in fact no promise. . . ." *Elmore v. Cone Mills Corp.*, 23 F.3d 855, 870 (4th Cir.1994). Consideration is defined as a bargained for exchange whereby the promisor (here Hooters) receives some benefit or the promisee (here Phillips) suffers a detriment. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1997 WL 474419 (7th Cir.1997). In order for Phillips' agreement to be enforceable, there must be a detriment to Hooters or benefit to Phillips that was bargained for in ex-

change for Phillips' promise to arbitrate her statutory claims.

"Often, consideration for one party's promise to arbitrate is the other party's promise to do the same." *Patterson v. Tenet Healthcare, Inc.*, 113 F.3d 832, 835 (8th Cir.1997) (applying ordinary contract principles to determine whether employee agreed to submit Title VII claims to arbitration). Thus, in *Gibson* the Seventh Circuit found an arbitration agreement illusory and unenforceable where it was one-sided, and only the employee was bound to submit claims to arbitration. In contrast, in the present case Hooters executed an arbitration agreement that bound it to arbitrate disputes ("you and the company each agrees [sic] that . . . the employee and the company agree to resolve any claims pursuant to the company's rules and procedures for alternative resolution of employment-related disputes, as promulgated by the company from time to time . . ."). However, under the Rules, incorporated into the arbitration agreement. "These Rules and Procedures may be modified, in whole or in part, by the Company from time to time, without notice." Rule 24–1. Moreover, "the Company may cancel the Agreement and Procedure on 30 days written notice," but no termination authority is given to the employee. Rule 23–1.

The question is whether the imperfect mutuality of obligation expressed in the Rules vitiates Hooters' promise to arbitrate set forth in the agreement. The Fourth Circuit has recognized that a promise whereby the promisor "retained an unlimited right to decide later the nature or extent of her performance" is, "in law no promise." *Glascock v. Commissioner of Internal Revenue*, 104 F.2d 475, 476 (4th Cir.1939). The court finds this principle applicable to the present situation. Here, it is clear that the obligations encompassed in the Rules dwarfed whatever promises were contained in the agreement. And even a casual inspection of the Rules yields that the obligations of the two

parties are not in equilibrium. For example, under the Rules, an employee's claim would be considered "waived" if arbitration were not commenced within specified time limits, but no similar waiver provision applies to Hooters. Rule 2–3. Similarly, when the employee initiates a claim he must file a detailed "content of notice" setting forth the particulars of his claim. Rule 6–2, but Hooters is under no similar obligation. The employee's witnesses must be sequestered. Rule 13–5, but not Hooters' witnesses. Under the Rules, Hooters retains exclusive authority to compile the record of the proceeding. Rule 18–1. Moreover, although Hooters may vacate under 9 U.S.C. § 10 any award if it proves merely "by the preponderance of the evidence" that the arbitrator exceeded his powers. Rule 21–4, it is not clear under the Rules that employees have any authority to seek a review of any arbitration award. Several additional disparities in obligation are contained in the Rules, but the preceding examples should suffice to illustrate the point.

Upon review of the differing obligations set forth in the Rules, the court concludes that Hooters retained to itself an unfettered "right to decide later the nature or extent of [its] performance" by reserving the authority to modify the Rules, or terminate the agreement, at its choice, while denying the same to Phillips. The court finds the agreement and Rules illusory, and unenforceable under South Carolina law on that basis.

### C. Fundamental Requirement of Arbitrator Impartiality and Fairness of Procedure

#### 1. Generally

The Supreme Court has recognized that arbitration must be a fair forum. "Any tribunal permitted by law to try cases and controversies not only must be unbiased but must also avoid even the appearance of bias." *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 148, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968).

Similarly, the FAA "does not authorize litigants to submit their cases and controversies to arbitration boards that might reasonably be though biased against one litigant and favorable to another." *Id.* As the court in *Cole* recognized:

> The Supreme Court in the *Gilmer* case did not hold that any sort of arbitration procedure before any manner of arbitrator would be satisfactory in the adjudication of public rights.

> . . . . .

> [A]n employee cannot be required as condition of employment to waive access to a neutral forum in which statutory employment discrimination claims may be heard. For example, an employee could not be required to sign an agreement waiving the right to bring Title VII claims in any forum. Although the employer could argue that such an agreement does not waive the substantive protections of the statute, surely such an agreement would nonetheless violate the law by leaving the employee's substantive rights at the mercy of the employer's good faith in adhering to the law. *At a minimum, statutory rights include both a substantive protection and access to a neutral forum in which to enforce those protections.*

105 F.3d at 1481. (emphasis added). Another court, in *Cheng–Canindin v. Renaissance Hotel Assocs.,* 50 Cal.App.4th 676, 57 Cal.Rptr.2d 867 (1996), pronounced that:

> Although arbitration can take many procedural forms, a dispute resolution procedure is not an 'arbitration' unless there is a third-party decision maker, a final and binding decision, and a mechanism to assure a minimum level of impartiality with respect to the rendering of that decision.

*Id.* at 871. From the preceding, the court announced that a *bona fide* arbitration agreement required five essential elements: (1) a third party decision maker; (2) a mechanism for ensuring neutrality with respect to the rendering of the deci-

sion; (3) a decision maker who is chosen by the parties; (4) an opportunity for both parties to be heard; and (5) a binding decision. *Id.* at 871–72. Applying those elements, the court in *Renaissance Hotel* found the "Review Committee procedure" utilized in an arbitration agreement unenforceable. The court found that the procedure lacked impartiality, was controlled exclusively by one of the parties to the dispute, and was really developed as a method to deal with internal hotel problems rather than legal claims.

Other cases have recognized how vitally important impartiality is to the arbitration process. One Oklahoma court noted:

> The arbitrator is part of a system of self-government which the parties have created. Parties are relatively free to select individuals as arbitrators although certain minimum standards of knowledge, impartiality and moral character are required which tend to equate a private arbitrator with a public judge. The United States Supreme Court in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), held that courts should be even more scrupulous to safeguard the impartiality of arbitrators than judges, because arbitrators are completely free to decide the law and determine the facts and are not subject to appellate review.

*Ditto v. Re/MAX Preferred Properties, Inc.*, 861 P.2d 1000, 1002 (Okl.App.1993) (quoting *Voss v. Oklahoma City*, 618 P.2d 925, 927 (1980)). Thus, in *Ditto* the court refused to compel arbitration where the arbitration agreement excluded one of the parties from any voice in the selection of the arbitrators.

More recently, in *Rosenberg v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 995 F.Supp. 190 (D.Mass.1998), the district court concluded that the defendant's structural dominance of the New York Stock Exchange arbitration rendered it an inadequate forum for the vindication of civil rights claims. Noting that the "chief guar-

antor of arbitrators' fairness and competence is the parties' powers to appoint the panel," the court invalidated a system in which, "most disturbingly, the Chairman of the Board [of the NYSE] also recommends and appoints the arbitration pools from which individual arbitrators are chosen ..." *Rosenberg* at 210.

■ Partly as a result of the preceding principles, courts have recognized that an arbitrator may not determine his own jurisdiction. *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos*, 25 F.3d 223 (4th Cir.1994) (arbitration clause required that arbitrators be chosen by mutual agreement of parties). Thus the rule is well-established that it is the court's responsibility to interpret an arbitration agreement's language regarding arbitrator selection. *Cargill Rice*, 25 F.3d at 225.

Courts have also expressed concern for fairness and equality in procedural aspects affecting arbitration. Thus, where one-sided procedures precluded one party from taking an appeal from an arbitration award, courts have not hesitated to find those procedures unconscionable and unenforceable. *Worldwide Ins. Group v. Klopp*, 603 A.2d 788 (Del.1992); *Trupp v. State Farm Mut. Auto. Ins. Co.*, 62 Ohio App.3d 333, 575 N.E.2d 847 (1989).

■ Applying the five *Renaissance Hotel* factors to the case at hand, it is apparent that the Hooters arbitration program fails to satisfy the minimum requirements for *bona fide* arbitration. Element (3), a decision maker selected by both parties, is lacking because for all practical purposes Hooters serves as the gatekeeper for all "Approved Arbitrators." Moreover, element (5), a binding decision, is also questionable because while any arbitration award is fully appealable by Hooters under Rule 21–4, it is unclear whether the employee has a parallel right under the Rules. Thus, there may be a lack of mutu-

ality in the "bindingness" of any award. The court therefore concludes that Hooters "arbitration" is sham arbitration, deliberately calculated to advantage Hooters in any proceeding in which claims are initiated against it.

### D. Whether Congress Intended Title VII Claims to be Nonarbitrable

#### 1. History of Arbitration of Statutory Claims

In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Supreme Court found that the plaintiff was not precluded from bringing a Title VII claim by the prior submission of his discrimination claim to final arbitration under a collective bargaining agreement. In so ruling the court emphasized that the arbitral process was not suited to the effective enforcement of Title VII because the arbitrator had "no general authority to invoke public laws that conflict with the bargain between the parties." *Id.* at 53, 94 S.Ct. 1011. The Court also expressed concern over the voluntariness of an individual's prospective waiver of a statutory civil right.

Ten years after *Gardner–Denver*, the Court revisited the controversy over arbitration of statutory rights in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). There, the court cast aside its previous doubts concerning the competency of an arbitral forum, and the Court found that the arbitral forum was presumptively competent to resolve statutory claims where a valid arbitration agreement existed. *Mitsubishi* dealt with Sherman antitrust claims, and its holding was subsequently extended to numerous other business-related claims, such as RICO or securities acts claims. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Notwithstanding the pro-arbitration stance

evident in *Mitsubishi*, however, lower courts were reluctant to extend its holding to civil rights claims because of the perceived shortcomings of the arbitral forum in addressing public rights and obligations and concern of the voluntariness of the waiver of the judicial forum.

However, in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court held that an ADEA claim could be subject to an arbitration agreement when the plaintiff agreed to arbitration under a "Uniform Application for Securities Industry Registration or Transfer." The Court in *Gilmer* noted that the FAA "provisions manifest a 'liberal federal policy favoring arbitration agreement.'" 500 U.S. at 25, 111 S.Ct. 1647. The Court in *Gilmer* also revealed its understanding of an arbitration forum:

> [b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.

*Id.* at 24, 111 S.Ct. 1647. After examining the test, history, and policies under the ADEA, the Court concluded that there was no inherent conflict between the ADEA and the enforcement of arbitration agreements covering age discrimination claims. Following *Mitsubishi*, the Court reiterated that there was a congressional presumption in favor of arbitration unless the party could demonstrate the (a) legislative history precluded arbitration of such claims, or (b) the party demonstrated "an 'inherent conflict' between arbitration and the [civil rights statute's] underlying purposes." *Id.* at 26, 111 S.Ct. 1647. In contrast, in *Gilmer* the plaintiff was unable to show a contrary legislative intent behind the ADEA and was unable to mount anything other than "generalized attacks" on arbitration, without specific proof. The Court concluded, therefore, that "there has been no showing in this case that those provisions are inadequate to guard against

potential bias." *Id.* at 31, 111 S.Ct. 1647. Thus, *Gilmer* left open the possibility of other cases in which individual waivers of federal civil rights would not be enforced, such as where coercion or fraud was exercised, or an unconscionable adhesion contract had been executed. *Mago v. Shearson Lehman Hutton, Inc.,* 956 F.2d 932, 934 (9th Cir.1992).

Subsequent lower court cases have readily extended *Gilmer* to arbitration of Title VII claims, including claims such as Phillips' sexual harassment claim, or other types of statutory claims. *See also Bender v. A.G. Edwards & Sons, Inc.,* 971 F.2d 698 (11th Cir.1992); *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305 (6th Cir. 1991): *Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229 (5th Cir.1991); *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875 (4th Cir.1996).

On the other hand, one court has refused to extend *Gilmer* to Title VII claims. In a second decision in *Rosenberg v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 995 F.Supp. 190 (D.Mass.1998), the district court denied a motion to compel arbitration, holding that Congress intended to preclude enforcement of mandatory, predispute arbitration agreements in Title VII cases.

As employers have come to realize that arbitration of civil rights claims will generally be enforced by the courts, the use of arbitration agreements as a condition of employment has multiplied. This growth, however, has come with not a small degree of controversy. Some critics, such as the EEOC, have consistently argued that although truly voluntary and non-binding types of alternative dispute resolution should be encouraged in the workplace, the type of binding arbitration at issue in this case is a waiver of statutory civil rights that should not be enforced. On July 10, 1997, the EEOC issued a policy statement that mandatory "arbitration of discrimination claims as a condition of employment [is] contrary to the fundamental principles of employment discrimination laws." As EEOC Chairman Casellas noted, "[I]t is simply not possible in the real world" for an employee to voluntarily agree to mandatory arbitration of future disputes. Following the EEOC pronouncement, the National Association of Securities Dealers (NASD), announced that it would abandon its longstanding mandatory arbitration of statutory discrimination claims for registered brokers. 8/25/97 *National Law Journal* B1. Congressional efforts have been initiated to preclude employers from utilizing arbitration agreements in such instances, but thus far no legislation has resulted.

**2. The Gilmer-exception: Where Arbitration is Inadequate to Protect Federal Rights**

Several recent cases present *Gilmer*-exceptions in which courts have refused to enforce arbitration agreements or portions of agreements (or confirm an award) because of public policy concerns and frustration of legislative intent. One of the first cases finding a public policy violation was *Graham Oil Co. v. ARCO Products Co.,* 43 F.3d 1244 (9th Cir.1994). There, the court held that an arbitration clause in a franchise distribution agreement violated the Petroleum Marketing Practices Act by compelling the franchisee to surrender important statutorily mandated rights under the Act, such as exemplary damages, attorney's fees, and a one-year statute of limitations. Because the court found the offending provisions to be integrated into one contract, and that severance was inappropriate where the offending provisions were an "integrated scheme to contravene public policy," the court denied enforcement of any part of the arbitration agreement. *Id.* at 1248.

Drawing on *Graham,* the District of Columbia Circuit Court of Appeals denied enforcement to a portion of an arbitration agreement that required the employee to pay all or part of the arbitrator's fees. In *Cole v. Burns Int'l Security Servs.,* 105 F.3d 1465 (D.C.Cir.1997), the court con-

cluded that such a provision would not be enforceable because it:

> would undermine Congress's intent [in enacting anti-discrimination laws by preventing] employees who are seeking to vindicate statutory rights from gaining access to a judicial forum and then requir[ing] them to pay for the services of an arbitrator when they would never be required to pay for a judge in court.

*Cole,* 105 F.3d at 1484. Thus, in order to uphold the balance of the arbitration agreement in *Cole,* the court construed the ambiguous clause concerning arbitrator fees in a fashion that imposed the duty on the employer to pay all of the fees.

More recently, the Eleventh Circuit held that a district court correctly refused to compel arbitration of a Title VII claim where damages in arbitration could be awarded for breach of contract only. In *Paladino v. Avnet Computer Technologies, Inc.,* 134 F.3d 1054, 1060 (11th Cir.1998), the court noted that the arbitration agreement contained language "fundamentally at odds with the purposes of Title VII because it completely proscribes an arbitral award of Title VII damages." As such the court concluded that the clause at issue deprived the employee of any hope of meaningful relief. In addition because the employee was responsible for steep filing fees, the agreement was not enforceable.

In another case, *Shankle v. B–G Maintenance Mgt. of Colorado, Inc.,* 1997 WL 416405 (D.Colo.), the court, applying *Cole,* denied the employer's motion to compel arbitration of Title VII, ADA, and ADEA claims. The offensive portion of the arbitration agreement required the employee to pay one-half of the arbitrator's fees, which the plaintiff was unable to do. Finding therefore that the arbitration agreement did not provide the employee with an effective means of vindicating his civil rights, the court found the agreement undermined Congressional intent and was unenforceable. Unlike *Cole,* however, the court in *Shankle* was unable to salvage any

form of arbitration agreement and denied the motion to compel arbitration entirely.

*Cole, Graham, Paladino* and *Shankle* are noteworthy because all represent instances in which courts, facing motions to compel arbitration, examined the agreements in terms of public policy implications and did not await an award review pursuant to 9 U.S.C. § 10. In other words, the courts found it inappropriate to postpone the public policy review until the post-award review stage under 9 U.S.C. § 10.

Hooters urges the court, however, to follow contrary rulings of two courts, *Great Western Mortgage Corp. v. Peacock,* 110 F.3d 222 (3d Cir.1997), and *Johnson v. Hubbard Broadcasting, Inc.,* 940 F.Supp. 1447 (D.Minn.1996), both of which found public policy review a post-award § 10 issue. The court finds these decisions manifestly distinguishable from the case at hand and therefore the court declines to follow their rulings.

In *Great Western,* a mortgage consultant attempted to bring a sexual harassment claim in violation of a New Jersey law prohibiting such discrimination. Prior to and shortly after her employment with defendant, she executed an arbitration agreement concerning her statutory claim. She claimed, in part, that she had not waived her rights under the New Jersey law and that the arbitration agreement abridged some of those rights in violation of public policy. The court concluded that the plaintiff had no evidence that the terms of the agreement were kept from her. Moreover, the court declined ruling on her public policy arguments, finding the matter was for the arbitrator to resolve.

In contrast to the *Great Western* arbitration agreement, the Hooters agreement contains a fundamental, threshold deficiency in arbitrator selection. In addition, the court finds that although Hooters' conduct did not rise to fraudulent inducement in enticing Phillips to execute the arbitration agreement, it was executed in a manner deliberately calculated to erect numerous

obstacles to an employee's discovery of the one-sided HOA Rules. There was no showing in *Great Western* of such conduct by the employer.

In *Johnson v. Hubbard Broadcasting, Inc.*, 940 F.Supp. 1447 (D.Minn.1996), the court compelled arbitration of a Title VII claim under an arbitration agreement that undeniably abridged the plaintiff's remedies under Title VII. *Hubbard* found that interpretation of the arbitration agreement should await the arbitrator's review. "The court cannot fully determine whether the arbitration agreement serves as a prospective waiver of Johnson's statutory rights until the arbitrator interprets and applies the agreement." *Id.* at 1459. Nevertheless the court cautioned:

> However, should the arbitrator find that the terms of the arbitration agreement deny Johnson the opportunity to recover the full array of statutory remedies established under state and federal law, the agreement would contravene federally and state established remedial measures, possibly rendering the agreement unenforceable as unconscionable.

*Id.* at 1461. The court rejects the *Hubbard* approach in the present case. *Hubbard*, of course, did not include the threshold arbitrator selection deficiency or procedural disparities that this case presents. Moreover, *Hubbard's* "wait and see" approach makes little practical sense when faced with an arbitration agreement that so flagrantly transgresses principles of Title VII and fundamental fairness. Finally, as outlined below in Section VI, Remedies of Contract Reformation or Severance, excision of the invalid arbitrator selection provisions and appointment of new arbitrators by the court, even if permitted under 9 U.S.C. § 5, would be of scant assistance here. Because of the vagaries of and multiple conflicting provisions of the Hooters Rules, clear interpretation of the Rules is impossible.

### 3. Public Policy as a Matter of Post–Award Review under 9 U.S.C. § 10

The authority of a court to consider the public policy implications of an arbitrator's decision is well-established. The Supreme Court has recognized that a court may refuse to enforce an arbitration award on public policy grounds only when such enforcement would "violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *United Paperworkers Int'l v. Misco, Inc.*, 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). This rarely-used ground for reversal "derives from the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act." *Id.* at 42, 108 S.Ct. 364. Thus, in addition to the four statutory grounds for vacating an arbitration award set forth in 9 U.S.C. § 10(a), the Fourth Circuit recognizes that such awards may also be vacated if they violate well-settled and prevailing public policy, fail to draw their essence from a collective bargaining agreement, or reflect the arbitrator's own notions of right and wrong. *Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union*, 76 F.3d 606 (4th Cir.1996).

In light of the preceding caselaw the court has, therefore, weighed whether consideration of Phillips' public policy arguments is more appropriately deferred until the award review stage. Hooters has contended that it is. However, the court rejects that notion for several reasons. First, unlike those cases in which public policy was reviewed at the award review stage, the analytical framework imposed in cases involving· arbitration of statutory rights, as enunciated in *Gilmer*, demands that the court undertake its public policy review as part of the first and third prongs of the *Genesco* test.

A second, more practical reason militates against deferral here. Because of the fatally defective arbitrator selection provisions of the Hooters Rules, the ambiguities and conflicts in the Rules, and the

boycott of HOA arbitration by several leading arbitration organizations, it is doubtful that a mutually-acceptable arbitration panel could be impanelled, and have authority to act effectively under the haphazard Rules.

"In other areas of Title VII relief, the law does not require a futile act as a precondition of relief." *Hairston v. McLean Trucking Co.,* 520 F.2d 226, 232 n. 2 (4th Cir.1975). Here, any arbitration commenced under the Hooters Rules would be ill-fated from the beginning because of the multiple one-sided, unconscionable provisions. The court will not require the performance of such an empty act. Although Hooters vigorously contends the court should adopt a "wait and see" approach to see if any final award would be tainted, the court does not find such an approach feasible in these peculiar circumstances. Here, if the arbitrators stay within the powers accorded them under the HOA agreement, they are destined to render an award violating the public policy behind Title VII. Thus, any award faithful to Title VII public policy will necessarily be susceptible to attack on the entirely separate ground that the arbitrators exceeded their powers, 9 U.S.C. § 10(a). Accordingly, the court finds consideration of Title VII public policy issues appropriate at this juncture.

## VI. REMEDIES OF CONTRACT REFORMATION OR SEVERANCE

### A. Generally

The court having concluded that the arbitration agreements executed by Phillips are unenforceable on grounds of unconscionability and public policy, the next question becomes whether, under any appropriate circumstances, the arbitration agreements can be reformed, or the identified illegal provisions of the Rules severed, thus preserving some type of arbitration agreement between the parties. The court has extensively considered this matter and has actively searched for a way in which the parties' mutual agreement to arbitrate

could be enforced, albeit in a more equitable forum than envisaged under the HOA Rules. The court has reluctantly concluded, however, that the court could not compel arbitration between these parties under some sort of modified, or court-devised arbitral proceeding without doing violence to several fundamental principles of federal arbitration and South Carolina contracts law.

### B. Reformation

■■ With regard to the equitable remedy of reformation of the contract, it is clear that under South Carolina law such remedy is appropriate only upon the ground of mistake. *Crewe v. Blackmon,* 289 S.C. 229, 345 S.E.2d 754 (App.1986). The court may not make a new agreement for the parties into which they did not enter. *See Eastern Business Forms, Inc. v. Kistler,* 258 S.C. 429, 189 S.E.2d 22 (1972). Because this court may not blue pencil the parties' arbitration agreement, the fact that another arbitration agreement with less onerous Rules might have been enforceable is irrelevant. "The apparent willingness of [the employer] to accept an interpretation of the covenant which would render the covenant proper in scope does not aid the invalidity of the covenant as written." *Faces Boutique, Ltd. v. Gibbs,* 318 S.C. 39, 455 S.E.2d 707, 709 (App.1995). *See also Eastern Business Forms, Inc. v. Kistler,* 258 S.C. 429, 189 S.E.2d 22, 24 (S.C.1972) ("We must uphold the covenant as written or not at all, it must stand or fall integrally."). Because the court finds an absence of any mistake in the entering into of the contract, reformation is not a potential remedy here.

### C. Severance

#### 1. Generally

■ The question whether the offending provisions of the Rules may be severed, and an enforceable arbitration contract preserved, raises different considerations. Hooters contends that the

invalid portions of the Rules can be severed, and the remainder enforced, particularly where, as here, an express severance provision was included in paragraph 3 of the arbitration agreement. The severance provision curiously stated:

> If any provision of this Agreement or the Rules is declared void, or otherwise unenforceable, such provision shall be deemed to have been severed from this Agreement, which shall otherwise remain in full force and effect; *provided that Company shall be permitted a reasonable opportunity to unilaterally amend this Agreement or the Rules to legally effect the ability of the Employee and the Company to arbitrate Claims as contemplated by this Agreement.*

Para. 3, Joint Exh. I. Although the first part of the above paragraph is standard language, the italicized provision is unique. It appears to provide that should the court conclude that the arbitration agreement is unenforceable, Hooters should be permitted "one more chance," or another opportunity to unilaterally revise its agreement and rules to comply with the law. Such provision suspends or usurps this court's authority to order appropriate remedial relief upon a showing of a violation of federal law. Title VII has no provision conferring on adjudicated transgressors "another chance" to reform their policies and procedures before the court decrees a violation and orders appropriate injunctive relief.

### 2. Arbitrator Selection Provisions and 9 U.S.C. § 5

Nor has Hooters convinced this court that the illegal portions of the arbitration agreements are capable of being severed from the remainder, with the balance enforced. The problem with respect to the arbitrator selection provisions is unique, and distinguishable from the merely one-sided nature of the other provisions. Hooters contends that if the court finds the arbitrator selection provisions invalid it may, pursuant to the severance clause, appoint an arbitrator under 9 U.S.C. § 5. It reads:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, *such method shall be followed;* but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in the filling of a vacancy, then upon application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire as the case may require.

9 U.S.C. § 5. The Fourth Circuit has recognized that the preceding provision strictly circumscribes a court's authority to appoint an arbitrator where, as here, the parties' agreement specifies a method of arbitrator selection. *Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos,* 25 F.3d 223 (4th Cir.1994).

The question is whether a court's striking of an arbitrator selection clause constitutes a "lapse in the naming of an arbitrator ..., or in the filling of a vacancy" under 9 U.S.C. § 5. No reported case has addressed whether an invalid arbitrator selection clause is a sufficient basis for declaring a "lapse." The precedent deals with cases in which there was an unavailability of a specific arbitrator, or one party refused to select an arbitrator based on a previously agreed upon plan. Thus, this court's authority to invoke § 5 upon striking the HOA arbitrator selection provision is not clearly established.

■■■ Arguably the broad language of § 5, "if for any other reason there shall be a lapse in the naming of an arbitrator," suggests that when a court strikes an arbitrator selection clause that might be a lapse sufficient to invoke the court's authority to appoint an arbitrator. The court's power under § 5 is, however, limited to those situations in which a party moves the court for the appointment of

arbitrators. Assuming the court were to decide to enforce the HOA arbitration agreement (minus the unconscionable Rules) but strike the arbitrator selection provision, would the court be empowered to act under § 5? Could the court find an effective solution here? The court finds it could not.

Assuming *arguendo* that a court is authorized to appoint arbitrators after the court has stricken an arbitrator selection provision, in the peculiar, narrow circumstances here the court's ability to locate qualified neutrals is highly compromised. Several arbitration experts, including Messrs. Nicolau, Maltby, and Professor Nolan, previously examined the HOA arbitral scheme and concluded that mainstream arbitration organizations would refuse to arbitrate under it.

### 3. Other Rules Provisions: Attempting to Reconcile Conflicting Provisions

Even without the fatally defective arbitrator selection provisions a serious question arises whether the other often conflicting provisions of the agreement are capable of interpretation and enforcement. "[A] contract should be treated as entire when by consideration of its terms, nature and purposes each and all of the parts appear to be interdependent and common to one another." J.D. Calamari & J.M. Perillo, *Contracts* 478 n. 76 (3 ed.1987).

■ In some cases of partial contractual illegality South Carolina courts have severed the illegal provision. Thus, in *Columbia Architectural Group v. Barker,* 274 S.C. 639, 266 S.E.2d 428 (1980), the court found an architectural contract severable where it contained several parts each of which could stand on its own. In contrast, here we do not have a situation in which an otherwise valid business contract contains a single unenforceable arbitration clause; the only contracts Phillips signed were arbitration agreements. Examination of the Hooters arbitration agreement and Rules demonstrates their highly interdependent nature. An arbitration proceeding is one single matter. The court has concluded that severance of the offending portions, which were highlighted above, with partial enforcement of the balance, is impractical here.

Aside from the facially invalid arbitrator selection provisions which make Hooters the gatekeeper for all "Approved Arbitrators," numerous other provisions are unconscionable. The court would have to fashion an alternative to each of the excised Rules, necessitating a major rewrite based on the extensive number of defective provisions. For example, the court would strike the illegal provisions limiting various forms of Title VII relief and modifying the burden of proof. The court would also find unenforceable those provisions which: impair the right of judicial review (Rule 17–4 and Rule 21–4), allow unilateral changes to Rules without notice (Rule 24–1), confer on Hooters total control over the record (Rule 18–1), bind administrative agencies such as the EEOC to apply the Hooters Rules (Rule 4–1(a)(2)), and allow for sequestration of only the employee's witnesses (Rule 13–5).

By way of illustration, and not as an exhaustive list, the court notes just three of the most visibly conflicting and nonsensical provisions. First, consider the significance of Rules 17–4, 21 and 22 read in conjunction. Rule 17–4 says "[t]he award shall be final and binding and not subject to review or appeal." However, Rule 21–1 states that Hooters arbitration is governed by the FAA, and that, under Rule 21–4, Hooters may seek a review or modification of any award. Strangely, the Rules make no provision for an employee to seek review of an unfavorable award, raising the question whether such a right is permitted at all under the Hooters Rules. Nevertheless, Rule 22–1 attempts to say that a party may pursue a statutory right to vacate or enforce an award, if it is "preserved by law," which begs the question whether the FAA preserves the employee's right to review.

Consider also Rule 21–1(b) which states, "[t]he substantive law of the applicable local, state and federal statutes, rules, regulations and common law shall be applied by the Adjudication Panel, subject to the limits set forth in these Rules, as amended from time to time." This provision suggests that the Rules supersede the substantive law of Title VII. To the contrary, though, Rule 22–1 assures us that "[n]othing in these Rules shall prevent a Party from pursuing a statutory right which is preserved by law," which, of course, suggests that Title VII law trumps the Hooters Rules. To add to the chaos, Rule 19–7 informs us that, "notwithstanding any other provisions of these Rules, the remedial authority of the Adjudication Panel extends to the full scope of (a) the relevant state and federal statutory provisions, or (b) the scope of these Rules, whichever is the less." Rule 19–7 is obviously inconsistent with both Rules 21–1(b) and 22–1.

Availability of attorney's fees is also a matter of some confusion under the Hooters Rules. For example, Rule 19–1 plainly enough provides that if the employee has sustained his burden of persuasion, he may be entitled to "expenses and costs of bringing the adjudication, if any, including reasonable attorney's fees and costs. . . ." This provision would suggest that the standard for awarding fees is that the employee simply be a prevailing party. However, Rules 20–1 and 20–2 set forth more specific criteria governing awards of attorney fees, which possibly operate as a limitation on Rule 19. They provide:

> 20–1 Sanctions—Frivolous Claims. The Adjudication Panel may award either Party its reasonable attorneys' fees and costs, including reasonable expenses associated with production of witnesses or proof, upon a finding that the claim or counterclaim was frivolous, or brought solely to harass the Employee, the Company or the Company's personnel.
>
> 20–2 Sanctions—Abuse of Procedure. The Adjudication Panel may award either Party its reasonable attorney's fees

and costs, including reasonable expenses associated with production of witnesses or proof, upon a finding that the other Party (a) engaged in unreasonable delay, (b) failed to comply with the Adjudication Panel's discovery order, or (c) failed to comply with requirements of confidentiality under these Rules.

Does Rule 20 circumscribe the cases in which the arbitrator may award reasonable attorney's fees to those which impose sanctions? The court need not resolve that question because of the foundational problem with Hooters arbitrator selection. The court merely recites these few examples of the Rules incomprehensibility in order to illustrate why severance would not be feasible.

Moreover, the court also finds equitable considerations counsel against attempting to salvage an enforceable arbitration agreement out of the balance of the Hooters Rules. Hooters was the sole drafter of the arbitration agreement, and presented its employees with the agreement on a take-it or agree-never-to-be promoted basis. Striving to locate an enforceable arbitration agreement from the few nonoffensive provisions of the Hooters Rules simply rewards Hooters for its unconscionable conduct in compiling such Rules. Based on the preceding, the court has rejected the idea of severing the illegal portions of the Rules to preserve some form of arbitration.

## VII. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's November 8, 1996, Motion for a Preliminary Injunction, treated by the court as a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, is DENIED.

IT IS FURTHER ORDERED that Plaintiff's and Counterclaim Defendant's February 25, 1997, Motion to Stay Proceedings Pending Arbitration, treated by the court as a motion to stay the non-arbitrable class claims pending arbitration

under the Federal Arbitration Act, 9 U.S.C. § 3, is DENIED.

IT IS FURTHER ORDERED that the tolling period for Hooter's Memorandum in Opposition to Phillips' Motion for Class Certification, filed July 15, 1997, is lifted and that Hooters' Memorandum in Opposition shall be filed on or before March 31, 1998.

IT IS SO ORDERED.